10-5179-cv
Wrobel v. County of Erie

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Submitted: February 15, 2012     Decided: August 1, 2012)

Docket No. 10-5179-cv

- - - - - - - - - - - - - - - - - - - -x

TIMOTHY M. WROBEL,

                 Plaintiff-Appellant,

        - v.-

COUNTY OF ERIE, DOUGLAS NAYLON, Individually and in his official capacity as a County Employee, DANIEL RIDER, Individually and in his official capacity as a County Employee,

                 Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - -x

    Before:      JACOBS, Chief Judge, CALABRESI and POOLER, Circuit Judges.

    Timothy Wrobel appeals from a judgment entered in the United States District Court for the Western District of New York (Curtin, J.), dismissing on summary judgment his First Amendment claims brought under 42 U.S.C. § 1983 against his former employer, Erie County, and certain employees. Because Wrobel failed to adduce evidence that his

mistreatment was caused by political association or by speech about matters of public concern, we affirm.

Judge CALABRESI dissents in a separate opinion.

Christen Archer Pierrot, Chiacchia & Fleming, LLP, Hamburg, N.Y. (Andrew P. Fleming, on brief), for Appellant.

David Sleight, Erie County Department of Law, Buffalo N.Y., for Appellees County of Erie and Daniel Rider.

Robert Louis Boreanaz, Lipsitz Green Scime Cambria LLP, Buffalo, N.Y., for Appellee Douglas Naylon.

DENNIS JACOBS, Chief Judge:

Timothy Wrobel appeals from a judgment entered in the United States District Court for the Western District of New York (Curtin, J.), dismissing on summary judgment his First Amendment claims brought under 42 U.S.C. § 1983 against his former employer, Erie County, and certain employees. Because Wrobel failed to adduce evidence that his mistreatment was caused by political association or by speech about matters of public concern, we affirm.

Wrobel was a longtime employee of Erie County's highway division. In 1999, a newly elected Republican county executive appointed the defendants as Wrobel's direct and indirect supervisors. Over the next eighteen months Wrobel's run-ins with them resulted in harassment of him and

2

his transfer to a faraway workplace. His direct supervisor, defendant Douglas Naylon, repeatedly referred to employees that predated his tenure as being part of the "old regime," and to the office under his supervision as the "new regime." Following his transfer, Wrobel made anonymous complaints to public officials and a confidential report to the FBI, for which he claims he was further persecuted. Wrobel's complaint alleges retaliation in violation of his First Amendment rights to free association and free speech. The thrust of the complaint is that Wrobel suffered discrimination because he was apolitical, and not politically aligned with the "new regime." Because we conclude that no reasonable jury could find that Wrobel's mistreatment was caused by any political activity--or inactivity--we affirm the district court's grant of summary judgment in favor of defendants.

**BACKGROUND**

Timothy Wrobel worked as a blacksmith at a highway maintenance facility of the Erie County highway department called the Aurora barn. In 1999, Republican Joel Giambra succeeded Democrat Dennis Gorski as Erie County Executive.

3

The new administration hired defendant Naylon as the senior highway maintenance engineer at the Aurora barn, in charge of day-to-day activities, including direct oversight of Wrobel and the other employees; defendant Rider was hired to run the entire highway department.

The record on summary judgment is extensive, but the salient facts can be summarized. Immediately after the defendants were hired by the county, Wrobel and his coworkers clashed with them. In January 2001, Wrobel confronted Naylon about what he perceived to be rudeness and disrespect. Naylon responded that the trouble with the Aurora barn was Wrobel and other workers from what Naylon labeled the "old regime," and suggested that Wrobel should transfer to another facility.

A few months later, Wrobel received written notice to appear for a disciplinary hearing on six charges: insubordination stemming from the January confrontation, falsifying his daily reports, leaving the job-site without permission, lateness, excessive breaks, and personal use of his work phone. The upshot of the disciplinary hearing was that Rider transferred Wrobel to another maintenance facility, the Tonawanda plant. The transfer greatly

4

lengthened Wrobel's commute, and the stress of this ordeal caused him to miss work for several weeks.

Although Wrobel admitted to some of the misconduct, he grieved the discipline on the ground that it was actually punishment for his friendship with Naylon's predecessor (and that Naylon's work expectations were unrealistic). An arbitrator ruled for the county, finding that "[t]he grievant seemed determined to function as an independent contractor," and that Wrobel justified his occasional tardiness because "no one ever complained to him about it." (J.A. 272-73.)

Soon after Wrobel's transfer, his wife joined with some of his former colleagues to expose Naylon and Rider's mistreatment of county workers, as well as other improper behavior they believed to be taking place in the highway department, such as misusing public funds and operating county equipment while intoxicated. In May 2001, the group sent letters about the Aurora barn--signed only by "Concerned Erie County Employees"--to the state Democratic chairman and the New York State attorney general complaining about the state of affairs at the Aurora barn. (Wrobel's wife also followed Naylon with a camera to catch him

5

misusing county equipment.)  In August 2001, Wrobel and others met with an FBI agent to float similar allegations about Naylon.

Wrobel alleges that Naylon and Rider punished him for speaking out against them.  Specifically, Naylon harassed him, told him to tell his wife to stay away from all County buildings, and accused him of being in contact with a former Aurora barn employee.  Shortly after his transfer to the Tonawanda plant, an Erie County sheriff questioned Wrobel about a theft of wood from the Aurora barn, and Wrobel alleges that the defendants inspired the inquiry.

During his tenure at the highway department, Naylon was overt in his dislike for those who had preceded him in the Aurora barn and his desire to purge the facility's hold-overs.  Early on, Naylon asked Wrobel, as a 22-year veteran of the Highway department, to advise as to who were the "good guys" and "bad guys," who were the employees that "do their jobs" and who are the "goof offs."  Wrobel demurred and told Naylon that he would soon figure it out himself.  A few months later, Naylon ordered Wrobel to tell a retired employee, Gary Kane, to stop coming by the Aurora barn.  Naylon told Wrobel that "it doesn't look good for me

and Joel Giambra and the new administration. He's retired from the Gorski administration, tell him to be on his merry way and enjoy himself." (J.A. 696.) Naylon referred to Kane as part of an "old regime."

Two former employees of the Aurora barn similarly suffered under Naylon's management. Anthony Marchitte was transferred from the Aurora barn to the Angola barn against his will, after being told the transfer was "in his best interests." Naylon gloated "the fat cat has just begun to sing . . . all you guys are going to be gone . . . things are really going to change around here." (J.A. 1003.) Wrobel's friend Timothy Elliot was also transferred from the Aurora barn in early 2001. Before his transfer, Naylon called him into his office and told him that "everything has to go through us," "that was the old regime, this is the new regime," and "if you're not with us, you're against us." (J.A. 1008.)

Other employees provided similar accounts. Paul Rebrovich was asked by Naylon if he was appointed by Gorski, and whether he was backed by the Gorski administration or the current administration. Rebrovich told him that nobody in his position was appointed by an administration and that

7

he had never been politically active. Naylon also boasted to him that, eventually, "we're going to get our own people in here" and "get rid of this old regime." (J.A. 946-47.)

Wrobel's deposition recounts a single instance in which political affiliation was discussed. On Naylon's first day on the job, he asked Wrobel about his political affiliation, and Wrobel told him that he was a Republican (as was Naylon). Elliot likewise reported a single instance: before his transfer out of Aurora, Naylon said to him "we know you guys are all democrats, hired by the other administration."

Wrobel's complaint alleged (relevant to this appeal) that defendants violated his (1) First Amendment right to freedom of association by harassing him because of his political association with the previous county administration and (2) First Amendment right to freedom of speech by retaliating against him for speaking about matters of public concern taking place within the Erie County highway department. An earlier panel of this Court found that both claims were adequately pleaded. See Wrobel v. Cnty. of Erie, 211 F. App'x 71, 72-73 (2d Cir. 2007). After discovery closed, defendants successfully moved for summary judgment on the ground that Wrobel had adduced insufficient evidence to raise a question of fact on either claim.

8

**DISCUSSION**

We review de novo a grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor.  See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).  Summary judgment is only appropriate when the evidence is "so one-sided that one party must prevail as a matter of law."  Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996) (internal quotation marks omitted).

**I**

"Public employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment."  Cobb v. Pozzi, 363 F.3d 89, 101 (2d Cir. 2004) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  The First Amendment right extends to associational conduct, including the decision not to support or affiliate with a political party or faction.  Id. at 102. "[C]onditioning public employment on the provision of support for the favored political party unquestionably inhibits protected belief and association."  Rutan v. Repulican Party of Illinois, 497 U.S. 62, 69 (1990) (internal quotation marks omitted).  To

9

succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action. See Camacho v. Brandon, 317 F.3d 153, 160 (2d Cir. 2003).

The First Amendment is thus violated when state officials engage in quintessential political patronage, as when a newly-elected county sheriff sought to fire Republican deputies to provide jobs to Democrats, see Elrod v. Burns, 427 U.S. 347, 372-73 (1976) (plurality opinion); when a public defender sought to dismiss Republican assistants based on party affiliation, see Branti v. Finkel, 445 U.S. 507, 517 (1980); and when a Governor was giving permission for the hiring, transferring, promotion, and recalling of only state employees who were Democrats, see Rutan, 497 U.S. at 69.

The protection of these cases has been extended to politically neutral employees who are treated less favorably than employees politically aligned with those in power, see Welch v. Ciampa, 542 F.3d 927, 939 & n.3 (1st Cir. 2008);

10

*Gann v. Cline*, 519 F.3d 1090, 1095 (10th Cir. 2008); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 273 (3d Cir. 2007), as well as to employees who suffer because of their political support of a losing faction of the party in power, *see* *McCloud v. Testa*, 97 F.3d 1536, 1551 (6th Cir. 1996).

However, not every association of a public employee can support a Section 1983 claim. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Only if an employee's speech or associational conduct "touches on a matter of public concern" can a First Amendment claim proceed. *Cobb*, 363 F.3d at 102; *accord* *Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985). Conduct that falls outside this class of activity is beyond the scope of the First Amendment's protections for public employee speech. *See* *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) ("[N]ot all speech by a public employee can provide the basis for a constitutional cause of action.").

11

The public-concern requirement "reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." Connick, 461 U.S. at 143. Whether association or speech is on a matter of public concern is a fact-intensive inquiry; nevertheless it is a question of law for the court to decide. See Lewis v. Cohen, 165 F.3d 154, 164 (2d Cir. 1999).

Wrobel characterizes his associational conduct as "not pledg[ing] his support for the Giambra administration" and "cho[osing] not to affiliate himself politically" with it. (Appellant Br. 11.) In Wrobel's first appeal, we decided that retaliation for such conduct, if adequately proven, could give rise to Section 1983 liability. Wrobel, 211 F. App'x at 72. Accordingly, we now consider only whether the evidence submitted on summary judgment is sufficient to raise a question of material fact, such that a jury could find that Wrobel did in fact engage in associational conduct related to a matter of public concern, and that defendants mistreated him as a result of that conduct.

12

The dispositive issue for Wrobel's free association claim is the causal relationship between the association identified and his transfer. To prove that his political indifference was the reason Naylon and Rider mistreated him, he relies principally on Naylon's references to an "old regime" and a "new regime." Assuming that this designation does in fact distinguish between employees brought in by Naylon and those already there when he arrived, there is no evidence or available inference that this distinction is political in the sense that it relates to any political, social, or other community concern. See Connick, 461 U.S. at 146. Wrobel submitted evidence that Naylon questioned him about his friends at work, ordered him to tell a friendly former co-worker to stay away from the Aurora barn, and blamed the "old regime" for difficulties at the Aurora barn. Nothing in the record demonstrates that the dysfunction at the Aurora barn was related to anyone's political association. The record shows instead a toxic form of "office politics" that, no matter how severe or how reprehensible, does not violate the First Amendment. See Klug, 197 F.3d at 858. Wrobel alleges no more than generalized references to a heightened standard of performance in the wake of a change of political regime.

13

That is simply to be expected when the voters replace one set of managers with another; the recently-elected call it reform. Naylon's passing references to a "new regime" and an "old regime", without more, cannot transform incompetent and heavy-handed management into a violation of the First Amendment.

Wrobel points to one sentence of Timothy Elliot's affidavit, quoting Naylon as stating "we know you guys are all democrats, hired by the other administration." (J.A. 1008.) This statement is not enough to create an issue of material fact as to whether Wrobel was being retaliated against for protected associational conduct: Naylon *knew* Wrobel to be a Republican. And the content of the Elliot affidavit renders any inference in Wrobel's favor even more implausible. Naylon also told Elliot that "we're forming a new team and I want to know if you're going to be on my team." (J.A. 1008.) This invitation is incompatible with the idea that Naylon was rejecting employees on the basis of partisan favoritism.

The record does support Wrobel's assertion that he did not pledge support for or politically align himself with the Giambra administration. That association, however, is a non sequitur in the context of this case. Wrobel was never asked

14

to donate to, volunteer for, or lend support to any political candidate when Naylon was his supervisor.  Other than being a registered Republican (the same as Naylon and Rider), he had no political affiliation or alliance at the office, and never discussed politics with anyone at the office.  True, an employee can no more be discriminated against for being apolitical than for being a member of the wrong political party.  See Morin v. Tormey, 626 F.3d 40, 44 (2d Cir. 2010).  However, the record must still support the fact that such a political association exists.  Wrobel cites no evidence showing that any employee did politically align with or pledge allegiance to the Giambra administration, how an employee would do that, or how he would be rewarded for doing so.

There is good reason to hold the plaintiff to his burden of proof in a free association case such as this.  New administrations and officials will often be brought into office specifically because of dissatisfaction with the status quo, and may be expected to implement reforms.  Old employees, especially those in under-performing jobs or facilities, will often be let go to make room for employees who are more capable, trusted or enthusiastic.  There is record evidence that Naylon and others believed the Aurora

barn to be troubled.  It is to be expected that employees affected by a new regime may resist reform measures regardless of political loyalties.  Moreover, in a reform context, it is to be expected that employees will be fired, demoted, or transferred soon after the change in administration, with the result that there is temporal proximity between the change in "regime" and the adverse employment action.

Absent evidence that the adverse employment action was politically motivated, the First Amendment gives a court no license to intervene in a public workplace whenever a new administration redeploys its workforce.  Evidence of political motivation can take different forms.  In cases of patronage, the record will often reveal that the plaintiffs were replaced by members or supporters of the ascendant party, or treated less favorably.  See, e.g., Elrod, 427 U.S. at 351.  This is so even if the associational conduct was the decision not to politically associate.  See Welch, 542 F.3d at 935 (plaintiff replaced by "vocal supporter" of prevailing faction); Galli, 490 F.3d at 269 (plaintiff told by superior that her office was "letting Republicans go," that "some Democrat [obviously] wants the spot," and that one has to "pay to play with this administration" (alterations in

16

Galli)). Evidence of political motivation may come in the form of overt pressure to work in a campaign, or donate to it, or vote a certain way. But unless evidence is required that an employee was adversely treated on account of a political association or abstention, any mistreatment of an apolitical public employee would go to a jury on a constitutional claim. See Galli, 490 F.3d at 277 (Baylson, J., dissenting).

Wrobel has not sustained his burden at summary judgment of creating a genuine issue of fact as to whether his mistreatment was the result of his lack of *political* allegiance to the new administration. There is ample evidence that the new administration viewed the Aurora barn as in need of reform. It is not enough for Wrobel to show mistreatment coupled with political abstention--there must be some evidence that the two are related, or an available inference that it is so. Naylon's passing references to the "old regime" adds little or nothing. New appointees may always be expected to avow an improvement in public services. To survive a motion under Rule 56(c), Wrobel needed to create more than a "metaphysical" possibility that his allegations were correct; he needed to "come forward with specific facts showing that there is a *genuine issue for trial*." Matsushita

17

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted).  He has not.

## II

Wrobel's second claim is that he suffered retaliation for speaking out against Naylon and Rider's treatment of employees and misuse of county property.  The showing required for a free speech claim is the same as for a free association claim.  To prevail on a Section 1983 free speech claim, a public employee must demonstrate (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection between the speech and the adverse employment action.  *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).  Even assuming that Wrobel has identified speech that touches on a matter of public concern, he has failed to show an adverse employment action or a causal connection between the speech and employment conditions that Wrobel deems adverse.

## A

Wrobel cites four instances of speech touching on a matter of public concern: (1) a May 1, 2001 letter to the

18

state chairman of the Democratic party complaining of Naylon's management style, misuse of county property, and corruption; (2) a similar letter sent to the New York State attorney general on May 17, 2001; (3) a July 2001 phone call by Wrobel's wife to the New York attorney general's office, the content of which is unknown; and (4) an August 23, 2001 meeting in which the Wrobels and other county workers met with an FBI agent to complain about Naylon's management style, misuse of county property, and corruption.

Not all of the communications can be attributed to Wrobel, and not all address matters of public concern. The letters to public officials were anonymous. There is no evidence in the record of a July 2001 phone call allegedly made by Wrobel's wife and, in any event, there is nothing to suggest that Wrobel participated in such a call. The grievances of the county employees related chiefly to the internal workings of the highway department, such as Naylon's mistreatment of employees, and therefore were not of public concern. See Connick, 461 U.S. at 147.

Nevertheless, we can safely assume for purposes of this appeal that Wrobel has proffered some evidence of speech on matters of public concern. Wrobel's statements that Naylon misused county equipment, falsified records, and directed

19

county business to friends are arguably of public interest. See Johnson v. Ganim, 342 F.3d 105, 112-13 (2d Cir. 2003). "[M]atters of public concern do include speech aimed at uncovering wrongdoing or breaches of the public trust." Glass v. Dachel, 2 F.3d 733, 741 (7th Cir. 1993).

**B**

"In the context of a First Amendment retaliation claim, we have held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks and alterations omitted); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006) (holding that antiretaliation provisions of Title VII apply where employers actions "could well dissuade a reasonable worker from making or supporting a charge of discrimination"). The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion,

20

reassignment to a place that aggravated physical disabilities, and express accusations of lying.  <u>Id.</u>

The main act of retaliation cited by Wrobel--his transfer to Tonowanda--predates his speech on a matter of public concern.  To fill that gap, Wrobel relies on three more acts of retaliation that began soon after the anonymous letters were sent: (1) a July 1, 2001 "interrogation," undertaken by Rider without the presence of a union representative, in which he told Wrobel to tell his wife to "stay out of the County buildings"; (2) Wrobel's questioning by a county sheriff about a theft at the Aurora barn; and (3) defendants' (orchestrated) false testimony at Wrobel's arbitration hearing in 2002.[1]

As to (1) and (2), such *de minimis* slights and insults do not amount to retaliation.  <u>Id.</u>  "It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that

---

[1] Wrobel's brief also portrays as retaliatory conduct the fact that his name appeared on Giambra's so-called "lay-off" list.  However, Wrobel was not laid off as a result, and there is no suggestion that he suffered some other adverse employment change as a result of appearing on that list.

21

exercise." Id. at 226 (internal quotation marks omitted).[2] The evidence does not support an inference that the July 1 interaction between Rider and Wrobel was the type of conduct that would "deter an individual of ordinary firmness from exercising his or her constitutional rights." Zelnik, 464 F.3d at 225 The same is true of the sheriff deputy's questioning of Wrobel. No competent evidence suggests that defendants initiated the investigation or accused Wrobel of theft, and the entire encounter consisted of a few polite questions, after which Wrobel was left alone.

The incident involving the grievance hearing contesting Wrobel's transfer has no support in the record. Wrobel's brief speculates, "on information and belief," that defendants "encouraged and bribed employees to testify against Mr. Wrobel, offering at least one employee a promotion in exchange for his negative testimony." (Appellant's Br. 43.) The only evidence cited is an email from Rider to Naylon asking him to attend the hearing and bring other employees who did "not want him back." The email

---

[2] However, a critical mass of minor incidents may support a claim for retaliation. Zelnik, 464 F.3d at 225; Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.").

22

is evidence that defendants disliked Wrobel; but Rider's defense of his past decision to transfer Wrobel is not retaliatory.

## C

Even if Wrobel had produced evidence that defendants took action sufficiently severe to constitute retaliation, Wrobel would still be required to produce evidence of a causal relationship between his speech--sending anonymous letters to state officials, and speaking confidentially with the FBI-- and the retaliation.

A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus. See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003). The sufficiency of such circumstantial evidence depends on the circumstances of each case. However, when (as here) the speech was made anonymously or confidentially, "[i]t is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002).

23

Wrobel argues that a jury could infer that defendants knew of his speech because they became aware in August 2001 that someone had anonymously submitted photographs of highway department personnel using county equipment on private property. It would be wholly speculative, however, for a jury to find that defendants believed Wrobel was the person responsible for these photographs. Wrobel argues for the inference on the basis that in April 2002 Rider called Wrobel's wife a "liar" at an arbitration concerning his transfer to Tonawanda. The incident occurred eight months later, and Rider's statement is vague and without context.[3] A reasonable jury could not find a causal connection between Wrobel's confidential and anonymous statements, and the conduct alleged to be retaliatory.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

---

[3] Wrobel also argues that knowledge of Wrobel's speech can be inferred from Naylon's statement at the March 2001 disciplinary hearing that "I don't give a f*** what legislator called me, it is not going to do you any good here." (J.A. 426.) Days earlier, Wrobel's wife had called to county legislators to complain of Naylon's mistreatment of his subordinates. However, her complaints did not touch on matters of public concern. See Connick, 461 U.S. at 147.

24

CALABRESI, J., dissenting:

I agree with the majority opinion in its description of the facts and history of this case, its statements of the controlling law in Parts I and II, and its ruling that Wrobel failed to raise questions of material fact warranting a trial on his First Amendment speech claim. I respectfully dissent, however, because I believe that Wrobel has adduced sufficient evidence to permit a trial on his First Amendment political association claim.

Undoubtedly, newly elected administrations are permitted to pursue reform. Such reform might well include ridding a public agency of underperforming employees hired by preceding administrations. And there is certainly evidence in the record that supports the defendants' claims that Wrobel and other employees hired by the preceding administrations were disobedient and inefficient. Even if these claims were shown to be true, however, the record is also rife with allegations of the defendants harassing their employees or otherwise treating them uncivilly. The tactics allegedly adopted by the defendants remind us that "reform" may carry its own abuses. But such abuses, as the majority rightly emphasizes, do not without more amount to a federal

1

claim. Specifically, for a First Amendment political association claim to be valid, there must be evidence that the abuses were politically motivated.

Unlike the majority, I believe that the record before us contains evidence that would permit a jury to conclude that an impermissible political agenda motivated the defendants' treatment of Wrobel. Considered on their own and without some indication of a political context, Naylon's many references to replacing "old regimes" with "new regimes" and forming "new teams" do not carry political valence. These terms could simply serve, in Naylon's manner of talking, to draw non-political lines between previously hired workers and Giambra's newer, and assertedly more effective, employees. In this I agree with the majority. Nevertheless, there is one statement in the record—acknowledged, but I think undervalued, by the majority—that I think would allow a jury to read political valences into all those otherwise neutral references.

Timothy Elliott stated in his affidavit of May 24, 2010: "At one point during one of the initial conversations I had with Naylon, he told me that, 'we know you guys are all democrats, hired by the other administration'. . . ." As I read the record, a jury could find that Naylon's remark about "democrats" was made in the same time frame as his other statements regarding

"regimes" and "teams." And, if it did so find, a jury could conclude that, for Naylon, the "old regime" was equivalent to "democrats," i.e., Naylon's *political* antagonists. A jury could then reasonably also find that Naylon's campaign to "get rid of [the] old regime" constituted a politically motivated purge.

Of course, Wrobel had declared himself a Republican during an early meeting with Naylon. But Wrobel has also alleged that—notwithstanding this early declaration— Naylon later accused him of being part of the "old regime" and "in the same boat" as Elliott and other pre-Giambra hires. In light of Wrobel's allegations and Elliott's testimony, it would be entirely plausible for a jury to conclude (a) that Naylon considered Wrobel part of a faction *politically* opposed to Giambra, and (b) that Naylon took adverse actions against him for this reason.

The facts of this case render our disposition a close call. But, all things considered, I would let a jury decide the validity of Wrobel's political association claim. For that reason, I respectfully DISSENT.