DENNIS JACOBS, Circuit Judge:
Liberty Mutual Insurance Co. operates a self-insured employee health plan. A Vermont statute requires all “health insurers” (including self-insured plans) to file with the State reports containing claims data and other “information relating to health care.” A State regulation specifies how such information must be recorded and transmitted.
When Vermont subpoenaed claims data from the Liberty Mutual plan’s third-party administrator, this suit was commenced in the United States District Court for the District of Vermont (Sessions, /.). Liber *500 ty Mutual sought a declaration that the Employee Retirement Income Security Act of 1974 (“ERISA”) preempts the Vermont statute and regulation. The district court granted summary judgment in favor of Vermont.
The ERISA preemption clause is not self-reading and ERISA preemption doctrine is not static. The early judicial consensus, based on the broad wording of the preemption clause (and legislative history), was to construe preemption broadly. More recent precedent has pulled back by setting a rebuttable presumption against preemption of state health care regulations. Two constants, however, remain: (1) recognition that ERISA’s preemption clause is intended to avoid a multiplicity of burdensome state requirements for ERISA plan administration; and (2) acknowledgment that “reporting” is a core ERISA administrative function. These two considerations lead us to conclude that the Vermont law, as applied to compel the reporting of Liberty Mutual plan data, is preempted. We therefore reverse and remand for entry of judgment in favor of Liberty Mutual.
BACKGROUND
I
The Vermont statute establishes and provides for the maintenance of “a unified health care database.” Vt. Stat. Ann. tit. 18, § 9410(a)(1). The database “enable[s]” the State’s Department of Banking, Insurance, Securities and Health Care Administration (“Department”)[1] “to carry out [its] duties ..., including”:
(A)determining the capacity and distribution of existing resources;
(B) identifying health care needs and informing health care policy;
(C) evaluating the effectiveness of intervention programs on improving patient outcomes;
(D) comparing costs between various treatment settings and approaches;
(E) providing information to consumers and purchasers of health care; and
(F) improving the quality and affordability of patient health care and health care coverage.

Id.

To populate the database, the statute requires “[h]ealth insurers, health care providers, health care facilities, and governmental agencies” to “file reports, data, schedules, statistics, or other information,” as the Department deems necessary, at the time and place and in the manner the Department requires. Id. at § 9410(c)-(d). The statute authorizes the Department to require the filing of “health insurance claims and enrollment information used by health insurers” and “any other information relating to health care costs, prices, quality, utilization, or resources.” Id. at § 9410(c).
Knowing and willful failure to comply is punishable by penalty of not more than $10,000 per violation. See id. at § 9410(g).
In 2008, the Department promulgated a regulation to implement the statute and create the Vermont Healthcare Claims Uniform Reporting and Evaluation System (the “Reporting System”). See Regulation H-2008-01, 21-040-021 Vt.Code R. § 1 (“Regulation H-2008-01”). The regulation requires reporting of myriad categories of claims data. See infra 508-10. “Health Insurers” are required to “regularly submit medical claims data, pharmacy claims *501 data, member eligibility data, provider data, and other information relating to health care provided to Vermont residents and health care provided by Vermont health care providers and facilities to both Vermont residents and non-residents in specified electronic format to the Department for each health line of business ... per the data submission requirements contained in” appendices to the regulation. Regulation H-2008-01 § 4(D).
A “[hjealth insurer” is defined broadly to include “any health insurance company, ... third party administrator, ... and any entity conducting administrative services for business or possessing claims data, eligibility data, provider files, and other information relating to health care provided to Vermont residents or by Vermont health care providers and facilities.” Id. § 3(X).
Begging the preemption question, the term “[hjealth insurer” “may also include, to the extent -permitted under federal law, any administrator of an insured, self-insured, or publicly funded health care benefit plan offered by public and private entities.” Id. (emphasis added). A health insurer with 200 or more enrolled or covered members in each month during a calendar year is designated a “Mandated Reporter.” Id. § 3(Ab). All other entities are “Voluntary Reporter[sj.” Id. § 3(As).
The Department makes the collected data “available as a resource for insurers, employers, providers, purchasers of health care, and state agencies to continuously review health care utilization, expenditures, and performance in Vermont.” Vt. Stat. Ann. tit. 18, § 9410(h)(3)(B). The Department decides “the extent” of such disclosure “allowed by HIPAA,” the federal Health Insurance Portability and Accountability Act of 1996, id., and maintains the “confidentiality code” by which filed information “is handled in an ethical manner,” id. § 9410(f). “[Djirect personal identifiers,” such as name, address, and Social Security number, may not be publicly disclosed. Id. § 9410(h)(3)(D).
Sixteen other states collect health care data for their own health care claims databases. J.A. 368-74 (State Health Reporting Laws Summary Table). Data submission requirements vary. Some states provide only for voluntary reporting. See id. Some expressly exclude self-insured employee plan data from their database reporting laws. See id. The majority, however, follow Vermont in requiring such plans to report claims data. See id.
II
Liberty Mutual Insurance Co. is the administrator and named fiduciary of a health plan (the “Plan”) that provides benefits to 137 individuals in Vermont and to over 80,000 individuals nationwide. The Plan is “self-insured” or “self-funded,” i.e., health care claims are paid from Liberty Mutual’s general assets.
Plan documents provide that the “Plan has been established for the exclusive benefit of Participants and except as otherwise provided ..., all contributions under the Plan may be used only for such purpose.” J.A. 39. The documents also represent that medical records, such as those related to risk factor screening, are kept “strictly confidential.” J.A. 71-72. The Plan represents, however, that it “shall comply with all other state and federal law to the extent not preempted by ERISA and to the extent such laws require compliance by the Plan.” J.A. 41.
Like many self-insured employer health plans, the Plan uses a third-party administrator (“TPA”). Blue Cross Blue Shield of Massachusetts, Inc. (“Blue Cross”), as the Plan’s TPA for Vermont participants, does *502 claims-handling: processing, review, and payment. Under its contract with Liberty Mutual, any information transferred to Blue Cross must be used solely for the purpose of administering the Plan, and Blue Cross auditors must guard against unauthorized disclosure of health care information. See J.A. 57-58. Liberty Mutual itself is a Voluntary Reporter because it has fewer than 200 covered members in Vermont (and has presumably decided not to volunteer); but because Blue Cross qualifies as a Mandated Reporter and possesses the Plan’s claims data, the reporting of its data is mandatory.
In August 2011, Vermont issued a subpoena demanding that Blue Cross supply the Plan’s “[eligibility files,” “[m]edical claims files,” and “[p]harmacy claims files” and threatened that noncompliance might result in fines and a suspension of Blue Cross’s authority to do business. J.A. 24-25. Liberty Mutual instructed Blue Cross not to comply and filed this suit, seeking (1) a declaration that ERISA preempts the Vermont statute and regulation; and (2) an injunction blocking enforcement of the subpoena. Vermont agreed to stay enforcement of the subpoena pending judicial resolution of the ERISA preemption question.
In dueling motions, Vermont sought to dismiss the complaint for lack of standing and for failure to state a claim, and Liberty Mutual moved for summary judgment. With the consent of the parties, the district court treated the motions as cross-motions for summary judgment. See Liberty Mut. Ins. Co. v. Kimbell, No. 2:11-cv-204, 2012 WL 5471225, at *1 (D.Vt. Nov. 9, 2012).
The court concluded that Liberty Mutual had Article III standing but that ERISA did not preempt the Vermont statute and regulation and that Vermont was therefore entitled to summary judgment. See id.
DISCUSSION
I
We agree with the district court that Liberty Mutual has standing to challenge the subpoena issued to Blue Cross.[2] Liberty Mutual has demonstrated “the irreducible constitutional minimum of standing”: (1) “an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical”; (2) “a causal connection between the injury and the conduct complained of’; and (3) that the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotation marks omitted).
It is of no moment that the subpoena was issued to Blue Cross and not directly to Liberty Mutual. The TPA agreement provides that Liberty Mutual will hold Blue Cross harmless for any financial charges “arising from or in connection with” the Plan. J.A. 54-55. Liberty Mutual therefore faces a choice between (1) allowing Blue Cross to turn over the Plan’s data in what Liberty Mutual considers a violation of its duties as Plan administrator and fiduciary; or (2) directing non-compliance, and indemnifying Blue Cross for the ensuing civil penalties. Either way, under Lujan, Liberty Mutual suffers a redressable injury-in-fact as a direct result of Vermont’s threatened, imminent action.
II
We review de novo the grant of summary judgment on the preemption *503 question. See, e.g., Wrobel v. Cnty. of Erie, 692 F.3d 22, 27 (2d Cir.2012). Summary judgment is appropriate if the record shows “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). “[W]e may reverse the grant of summary judgment and order judgment for the non-moving party if we find undisputed support in the record entitling the non-moving party to judgment as a matter of law.” New England Health Care Emps. Union v. Mount Sinai Hosp., 65 F.3d 1024, 1030 (2d Cir.1995).
A
ERISA’s comprehensive regulatory scheme governs most employee benefit plans, including self-insured health plans. See 29 U.S.C. § 1003. ERISA requires plan administrators to file annually with the Department of Labor reports detailing financial and actuarial information. See id. §§ 1021-1024. The Department of Labor is authorized “to undertake research and surveys and in connection therewith to collect, compile, analyze and publish data, information, and statistics relating to employee benefit plans.” Id. § 1143. ERISA broadly preempts “any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.” Id. § 1144(a) (emphasis added). With remarkable consistency, the legislative history reflects that this broad wording was purposeful: it was intended to eliminate the threat of a multiplicity of conflicting or inconsistent state laws,[3] and to achieve broad preemptive effect in the areas of record-keeping, reporting, and disclosure.[4]
Vermont argues — and the district court agreed — that Congress could not have intended broad preemption of state reporting laws because the same Congress also passed the National Health Planning and Resources Development Act of 1974 (“NHPRDA”). The NHPRDA provided for the establishment of state health planning agencies and authorized these agencies to “assemble and analyze data concerning” health; health care delivery, resources, and use; and related environmental factors. See Pub.L. No. 93-641, 88 Stat. 2225, at § 1513(b) (1975). The Supreme Court consulted the NHPRDA to decide ERISA preemption in a case in which the NHPRDA expressly contemplated a state regulatory measure. See N.Y. State Conference of Blue Cross & *504 Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 665-67, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Here, however, the NHPRDA is not similarly indicative.[5] And if there were tension between NHPRDA and ERISA, it was relieved in 1986 when the NHPRDA was repealed.
B
The Supreme Court, and this Court, initially applied ERISA preemption as broadly as the statutory phrase (“relate to any employee benefit plan”) seemed to require.
As explained in Shaw v. Delta Air Lines, Inc., the “breadth of [ERISA’s] preemptive reach is apparent from that section’s language.” 463 U.S. 85, 96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); see id. at 98, 103 S.Ct. 2890 (“Congress used the words ‘relate to’ ... in their broad sense.”).[6] Shaw formulated the modern ERISA preemption test: a state law is preempted if “it [1] has a connection with or [2] reference to [an ERISA] plan.” Id. at 96-97, 103 S.Ct. 2890 (emphases added). The Court treated as obvious that ERISA preempted “state laws dealing with the subject matters covered by ERISA — reporting, disclosure, fiduciary responsibility, and the like.” Id. at 98, 103 S.Ct. 2890 (emphases added). The open question was whether preemption went beyond these core areas, and the Court held it did. See id. at 96-97, 103 S.Ct. 2890. The one note of caution in Shaw was consigned to a footnote:
Some state actions may affect employee benefits plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law “relates to” the plan. Cf. Am. Tel. & Tel. Co. v. Merry, 592 F.2d 118, 121 (C.A.2 1979) (state garnishment of a spouse’s pension income to enforce alimony and support orders is not pre-empted). The present litigation plainly does not present a border-line question, and we express no views about where it would be appropriate to draw the line.
Id. at 100 n. 21, 103 S.Ct. 2890.
For another decade, the Supreme Court and this Court followed Shaw and repeatedly emphasized the broad reach of ERISA preemption. See, e.g., FMC Corp. v. Holliday, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (“The pre-emption clause is conspicuous for its breadth.”); Gen. Elec. Co. v. N.Y. State Dep’t of Labor, 891 F.2d 25, 29 (2d Cir.1989) (“ERISA was intended to have a ‘sweeping preemptive effect in the employee benefit plan field.’ Congress intended ERISA to occupy and regulate the field of employee benefit plans.” (citation omitted)). The threat of conflicting state and local regulation was consistently cited as a paramount reason for preemption: Preemption “was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives *505 among States or between States and the Federal Government.” Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478,112 L.Ed.2d 474 (1990); see Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 10, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (“We have not hesitated to enforce ERISA’s pre-emption provision where state law created the prospect that an employer’s administrative scheme would be subject to conflicting requirements.... Such a situation would produce considerable inefficiencies, which the employer might choose to offset by lowering benefit levels.”); Howard v. Gleason Corp., 901 F.2d 1154, 1157 (2d Cir.1990) (“[T]he express pre-emption provisions of ERISA are deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern in order to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations.” (citations and internal quotation marks omitted)).
These cases specifically re-emphasized that “reporting” and “disclosure” are core ERISA functions subject to a uniform federal standard. See Ingersoll-Rand, 498 U.S. at 137, 111 S.Ct. 478 (“[ERISA] sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility....”); FMC Corp., 498 U.S. at 58, 111 S.Ct. 403 (listing “reporting” and “disclosure” as “subject matters covered by ERISA”).
The Supreme Court has explained the importance of having uniform federal record-keeping and reporting requirements:
[The legislative history] reflects] recognition of the administrative realities of employee benefit plans. An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements. The most efficient way to meet these responsibilities is to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with certain fiduciary standards in some States but not in others.
Fort Halifax, 482 U.S. at 9, 107 S.Ct. 2211 (emphases added).
Liberty Mutual places great weight on the Supreme Court’s summary affirmance of one of these early preemption cases, Standard Oil Co. v. Agsalud, 633 F.2d 760, 763 (9th Cir.1980). We need not rest our ruling on that case or on so perfunctory a disposition as summary affirmance.[7] At the same time, it is telling *506 that when Congress amended ERISA in 1983 “to exempt from pre-emption certain provisions of the Hawaii Act,” it “did not exempt from pre-emption those portions of the law dealing with reporting, disclosure, and fiduciary requirements.” Fort Halifax, 482 U.S. at 13 n. 7, 107 S.Ct. 2211; see H.R.Rep. No. 97-984, at 18 (Dec. 21, 1982) (Conf.Rep.) (“The provision continues Federal preemption of State law with respect to matters governed by the reporting and disclosure and the fiduciary responsibility provisions of ERISA....”).
C
The Supreme Court’s 1995 decision in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co. marked something of a pivot in ERISA preemption. See 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The Court began “with the starting presumption that Congress does not intend to supplant state law,” especially if the “state action [occurs] in fields of traditional state regulation,” like health care.[8] Id. at 654-55, 115 S.Ct. 1671. To preempt, a “clear and manifest purpose” by Congress is required. Id. at 655, 115 S.Ct. 1671. Following on this presumption, the Court pulled back on its broad, literal reading of “relate to”: if the phrase “were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course.” Id.
Applying the two-part Shaw test in light of these new principles, the Court concluded that a state statute requiring hospitals to collect a surcharge from patients covered by commercial insurers was not preempted. See id. at 656, 115 S.Ct. 1671. The Court explained that state law is preempted if it “mandate[s] employee benefit structures or their administration” or “provides] alternative enforcement mechanisms.” Id. at 658, 115 S.Ct. 1671. The state surcharge law withstood preémption in Travelers because it had no more than an “indirect economic influence” on ERISA plans, it did “not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself,” and it did not “preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one.” Id. at 659-60,115 S.Ct. 1671.
The Court again recognized the central roles of reporting and disclosure: ERISA “controls the administration of benefit plans, as by imposing reporting and dis *507 closure mandates.” Id. at 651, 115 S.Ct. 1671 (emphasis added) (citation omitted). “Congress’s extension of pre-emption to all state laws relating to benefit plans was meant to sweep more broadly than state laws dealing with the subject matters covered by ERISA, reporting, disclosure, fiduciary responsibility, and the like.” Id. at 661, 115 S.Ct. 1671 (emphases added) (internal quotation marks and brackets omitted).
Applying Travelers, cases conclude that state laws having only an “indirect economic effect on ERISA plans” lack sufficient “connection with” or “reference to” an ERISA plan to “trigger ERISA preemption.” New England Health Care Emps. Union v. Mount Sinai Hosp., 65 F.3d 1024, 1030-33 (2d Cir.1995); see also De Buono v. NYSA-ILA Med. & Clinical Sews. Fund, 520 U.S. 806, 809, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (state hospital tax not preempted); NYS Health Maint. Org. Conference v. Curiale, 64 F.3d 794, 801-03 (2d Cir.1995) (“[O]nly link [state surcharge law] has with ERISA plans is its indirect effect on rate diversification among insurers.”). Nevertheless, the Supreme Court teaches that Travelers and its progeny do not disturb the long-standing principle that “state statutes that mandate[ ] employee benefit structures or their administration ” have a “connection with” ERISA plans and are therefore preempted. Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., 519 U.S. 316, 328, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (emphasis added) (internal quotation marks omitted). Like Travelers itself, later cases reiterate that “ERISA is expressly concerned” with “reporting, disclosure, fiduciary responsibility, and the like.” Id. at 330, 117 S.Ct. 832 (internal quotation marks omitted); see also Boggs v. Boggs, 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997); Plumbing Indus. Bd. v. E.W. Howell Co., 126 F.3d 61, 66 (2d Cir.1997).
The use of preemption to avoid proliferation of state administrative regimes also remains a vital feature of the law. “[D]iffering state regulations affecting an ERISA plan’s system for processing claims and paying benefits impose precisely the burden that ERISA pre-emption was intended to avoid.” Egelhoff v. Egelhoff, 532 U.S. 141, 150, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) (emphasis added) (internal quotation marks omitted); see Romney v. Lin, 94 F.3d 74, 80 (2d Cir. 1996) (“basic purpose” of ERISA preemption is to “avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans”).
It is true that this Court’s three most recent cases focus primarily on “the relationships among the core ERISA entities,” and caution against preemption of generally applicable state laws. See Stevenson v. Bank of N.Y. Co., 609 F.3d 56, 61 (2d Cir.2010); Hattem v. Schwarzenegger, 449 F.3d 423, 429-31 (2d Cir.2006); Gerosa v. Savasta & Co., 329 F.3d 317, 324 (2d Cir. 2003). But these cases involve either a state income tax with only indirect economic effects (the kind of law Travelers expressly permits), see Hattem, 449 F.3d at 425, or state law causes of action that have “little to do with the conduct of the plan,” Gerosa, 329 F.3d at 328; see also Stevenson, 609 F.3d at 61 (noting that state law suit did not implicate “actual administration” of the plan). They do not purport to save state laws that subject plans to “sets of inconsistent state obligations” or that “tend to control or supersede central ERISA functions.” Gerosa, 329 F.3d at 324, 328.
When this Court has allowed a state reporting requirement to withstand preemption, as it has in two post-Travelers cases, the requirement:
(1) imposed no “particular form” of record-keeping and created burdens “so *508 slight” as to “create[ ] no impediment to an employer’s adoption of a uniform benefit administration scheme,” Burgio & Campofelice, Inc. v. NYS Dep’t of Labor, 107 F.3d 1000, 1009 (2d Cir.1997) (internal quotation marks omitted); or
(2) “sought information readily obtainable from an employer” without specifying “a particular form of record-keeping,” HMI Mech. Sys., Inc. v. McGowan, 266 F.3d 142, 150-61 (2d Cir. 2001).
In effect, these cases adhere to the intact pre-Travelers principle against preemption of laws “creating] no impediment to an employer’s adoption of a uniform benefit administration scheme,” Fort Halifax, 482 U.S. at 14, 107 S.Ct. 2211, and with “too tenuous, remote, or peripheral” an effect on employee benefit plans, Shaw, 463 U.S. at 100 n.' 21, 103 S.Ct. 2890. Thus HMI (which Vermont relies on heavily) cautioned that state subpoenas would indeed be “overbroad to the extent that they seek the amount of benefits that employees receive” or “examin[e] employer contributions on a benefit by benefit basis.” HMI, 266 F.3d at 151.
D
We hold that the reporting requirements of the Vermont statute and regulation have a “connection with” ERISA plans (though no. “reference to” them[9]) and are therefore preempted as applied. Our holding is supported by the principle (undisturbed in Travelers) that “reporting” is a core ERISA function shielded from potentially inconsistent and burdensome state regulation.[10]
ERISA preempts “state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like.” Shaw, 463 U.S. at 98, 103 S.Ct. 2890 (emphases added). “[Reporting” is necessarily a function distinct from the disclosure that administrators provide beneficiaries; otherwise “reporting” would be subsumed by “disclosure” and rendered superfluous. Rather, “reporting” entails what Vermont requires be done; plan record-keeping, and filing with a third-party.
But whatever the scope of plan “reporting,” Vermont cannot deny that that is what it is seeking. The relevant database is called the “Vermont Healthcare Claims Uniform Reporting and Evaluation System” and the operative section of the regulation is titled “Reporting Requirements.” [11] Regulation H-2008-01 §§ 3(Ar), 4 (emphases added).
*509 Not every state law imposing a reporting requirement is preempted. Burgio and HMI allow a slight reporting burden to be laid on plans, consistent with the preemption rule tolerating laws that “create[ ] no impediment to an employer’s adoption of a uniform benefit administration scheme,” Fort Halifax, 482 U.S. at 14, 107 S.Ct. 2211, and with “too tenuous, remote, or peripheral” an effect on employee benefit plans, Shaw, 463 U.S. at 100 n. 21, 103 S.Ct. 2890.
But the reporting mandated by the Vermont statute and regulation is burdensome, time-consuming, and risky. Even considered alone, the Vermont scheme triggers preemption; considered as one of several or a score of uncoordinated state reporting regimes, it is obviously intolerable.
A quick overview of the Reporting System is telling:
• Plans must periodically report:
(1) “medical claims data” “composed of service level remittance information for all non-denied adjudicated claims for each billed service including, but not limited to member demographics, provider information, charge/payment information, and clinical diagnosis and procedure codes, and ... including] all claims related to behavioral or mental health”;
(2) “pharmacy claims data” “containing service level remittance information from all non-denied adjudicated claims for each prescription including, but not limited to: member demographies^] provider information^] charge/payment information!]] and national drug codes”;
(3) “member eligibility data” “containing demographic information for each individual member eligible for medical or pharmacy benefits for one or more days of coverage at any time during the reporting month”;
(4)and any “other information relating to health care provided to Vermont residents and health care provided by Vermont health care providers and facilities to both Vermont residents and non-residents ... for each health line of business.” Regulation H-2008-01 §§ 3-4.
• Plans must report their data frequently. Thus plans with 500 to 1,999 covered members must report quarterly and plans with 2,000 or more covered members must report monthly. See id. § 6(1). Compare this to ERISA, which requires a single report annually. See 29 U.S.C. § 1021.
• Data must be coded under the appropriate source code system. See Regulation H-2008-01 § 5(A)(5)(a). Sixteen source code systems are provided, including the “Admission Source Code” (“[a] variety of codes explaining who recommended admission to a medical facility”) and the “International Classification of Diseases, 9th Revision, Clinical Modification” code (“describes the classification of morbidity and mortality information for statistical purposes and for the indexing of hospital records by disease and operations”). Id. Appendix A.
• “Individual data elements, data types, field lengths, field description/code assignments, and mapping locators” for each file must conform to specified requirements. Id. § 5(B). Fields include “Admission Hour” and “Discharge Hour,” thirteen “Diagnosis” *510 fields, three “Procedure” fields, and the “Drug Name” and “Quantity Dispensed”. Id. Appendices C-l-E-2.
• “[T]he social security number of the member/subscriber and the subscriber and member names” must be encrypted prior to submission by “utilizing a standard encryption methodology provided.” Id. § 5(A)(5)(b). (Encryption is not required for other data fields.)
And nothing prevents the Department from changing these myriad requirements from time to time, so long as the Department complies with the broad mandate of the statute.
The confidentiality provisions of the Vermont scheme are complex but loose, and impair or (at least) reassign the obligation in the Plan documents to keep medical records strictly confidential, as well as the undertaking by Blue Cross as TPA to use information solely for Plan administration purposes and to prevent unauthorized disclosure.[12] The regulation specifically contemplates “access to health care claims data sets and related information” by “persons other than the Department.” Id. § 8. Each data field is classified into one of three “use and release” categories:
(1) “Unavailable Data Elements”: not available for general use and release.
(2) “Restricted Data Elements”: only available for use and release as part of a “Limited Use Research Health Care Claims Data Set” approved by the Department. These elements, and information that can be derived from these elements, include the member’s city and zip code, the admission and discharge dates and hours, and the service provider and pharmacy names.
(3)“Unrestricted Data Elements”: “available for general use and public release.... upon written request.” These publicly available elements, and information that can be derived from these elements, include the member’s gender, age, medical coverage, prescription drug coverage, and diagnosis; the type of procedure; the service provider’s speciality and zip code; and the name and price of any drugs prescribed.
Id. § 8 & Appendices J-l-J-14. Specific as these categories are, they may be illusory, because the Department can ease public release restrictions on data that is currently restricted or unavailable, so long as “direct” personal identifiers are not published and the data is (in the Department’s opinion) handled in an “ethical manner.” Vt. Stat. Ann. tit. 18, § 9410(e)-(f), (h)(3)(D).
Since other states can impose their own regimes for reporting — and many do— these burdens and risks must be multiplied.
The trend toward narrowing ERISA preemption does not allow one of ERISA’s core functions — reporting—to be laden with burdens, subjected to incompatible, multiple and variable demands, and freighted with risk of fines, breach of duty, and legal expense.[13]
*511 CONCLUSION
For the foregoing reasons, we reverse and remand with instructions to enter judgment for Liberty Mutual.
Judge STRAUB dissents in part and concurs in part in a separate opinion.

. The Department is now called the Department of Financial Regulation. Many of the Department's health care database responsibilities were recently transferred to Vermont’s Green Mountain Care Board. See id. § 9410.

. The parties have not briefed the standing issue on appeal, but Article III standing “is the threshold question in every federal case, determining the power of the court to entertain the suit.” Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

. See 120 Cong. Rec. 29197 (1974) (Statement of Rep. Dent) ("I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation.”); id. at 29933 (Statement of Sen. Williams) (discussing “inten[t] to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans” and stating that “[t]his principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law”).

. See S.Rep. No. 93-127, at 35 (1973), reprinted in 1974 U.S.S.C.A.N. 4838, 4871 (“Because of the interstate character of employee benefit plans, the Committee believes it essential to provide for a uniform source of law in the areas of vesting, funding, insurance and portability standards, for evaluating fiduciary conduct, and for creating a single reporting and disclosure system in lieu of burdensome multiple reports.” (emphasis added)); H.R.Rep. No. 93-533, at 17 (1973), reprinted in 1974 U.S.S.C.A.N. 4639, 4655 (virtually the same); see also 120 Cong. Rec. 29942 (1974) (Statement of Sen. Javits) (“In view of Federal preemption, State laws compelling disclosure from private welfare or pension plans ... will be superseded.”).

. The NHPRDA’s encouragement of state data collection is not necessarily inconsistent with ERISA's preemptive reach. A lot of data can be collected from health care providers, and from health care payers other than ERISA plans. Nothing in the NHPRDA compels the conclusion that, contrary to every indication in ERISA’s text and history, Congress intended to allow a multiplicity of state record-keeping and reporting requirements for self-insured employee plans.

. That interpretation was supported by ERISA’s exemption for generally applicable state criminal statutes, an exemption that would be unnecessary if preemption "applied only to state laws dealing specifically with ERISA plans.” Shaw, 463 U.S. at 98, 103 S.Ct. 2890 (discussing 29 U.S.C. § 1144(b)(4)).

. The district court in Standard Oil Co. of California v. Agsalud held that a Hawaii law (1) requiring workers to be covered by a comprehensive prepaid health care plan and (2) imposing “certain reporting requirements which differ[ed] from those of ERISA,” was preempted. 442 F.Supp. 695, 696, 706-07 (N.D.Cal.1977). Though the ruling rested mainly on the state’s comprehensive prepaid plan requirement, the court added that the ERISA preemption clause "was intended at the very least to preempt state laws regulating disclosure [and] reporting.” Id. at 706 n. 11. The Ninth Circuit agreed with the district court, 633 F.2d 760, 763 (9th Cir.1980), and the Supreme Court summarily affirmed, Agsa- *506 lud v. Standard Oil Co., 454 U.S. 801, 102 S.Ct. 79, 70 L.Ed.2d 75 (1981). However, "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions.” Anderson v. Celebrezze, 460 U.S. 780, 784 n. 5, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (internal quotation marks omitted).

. The dissent relies on this presumption. See Dissenting Op. at 512-13. We acknowledge that the presumption applies when the state law "operates in a field that has been traditionally occupied by the States,” and that "the historic police powers of the State include the regulation of matters of health and safety.” De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (internal quotation marks omitted). However, state health data collection laws do not regulate the safe and effective provision of health care services, which is among the states’ historic police powers. And collecting data can hardly be deemed "historic” — most such laws were enacted only within the last ten years. See J.A. 368-74. In any event, the Supreme Court has repeatedly found the presumption overcome if the state laws "upset[] the deliberate balance central to ERISA,” even if those laws "implement policies and values lying within the traditional domain of the States.” Boggs v. Boggs, 520 U.S. 833, 840, 854, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). *509 preempt.” Dissenting Op. at 511. But the conclusion does not follow from the premise. To the contrary: A hodge-podge of state reporting laws, each more onerous than ERISA’s uniform federal reporting regime, and seeking different and additional data, is exactly the threat that motivates ERISA preemption.

. The Vermont statute and regulation lack "reference to" an ERISA plan because they apply to all health care payers and do not act "exclusively upon ERISA plans.” Dillingham, 519 U.S. at 325, 117 S.Ct. 832; Travelers, 514 U.S. at 656, 115 S.Ct. 1671. A "connection with" an ERISA plan is sufficient, however, for preemption. Shaw, 463 U.S. at 96-97, 103 S.Ct. 2890 (setting out disjunctive test).

. It is of no moment that the law is being applied to, and the subpoena targeted at, Liberty Mutual's TPA rather than Liberty Mutual itself. See Pharm. Care Mgmt. Ass’n v. Dist. of Columbia, 613 F.3d 179, 182 (D.C.Cir.2010) (holding ERISA preempts state law provisions "insofar as they apply to a pharmaceutical benefits manager ... under contract with an employee benefit plan (EBP) because they 'relate to' an EBP”). We agree with the D.C. Circuit that “the objective of uniformity in plan administration" is not "for some reason inapplicable simply because a plan has contracted with a third party to provide administrative services." Id. at 185.

. The dissent argues that the "reporting requirement imposed by the Vermont statute differs in kind from (he 'reporting' that is required by ERISA and therefore was not the kind of state law Congress intended to

. Whether disclosure to Vermont is authorized under the Plan documents may turn on whether Vermont law creates authorization, because the Plan undertakes to comply with state law; but compliance is allowed only "to the extent not preempted by ERISA," a limitation that leaves the Plan and the TPA in a complex and expensive legal muddle.

. The dissent draws a "distinction between general administration and administration of plans, claims, and benefits” and concludes that ERISA preemption doctrine does not reach state reporting laws that implicate the former. Dissenting Op. at 516. Essentially, the dissent would preempt state reporting laws only if they require plans to submit financial statements. The dissent's view of ERISA plan “administration” and “reporting” is unduly narrow.
*511 The overview of requirements (set out above) makes clear that Vermont requires ERISA plans to record, in specified format, massive amounts of claims information and to report that information to third parties, creating significant (and obvious) privacy risks and financial burdens that will be passed from the TPA to the Plan and from the Plan to the beneficiaries. That is not a proper allocation of plan assets. See 29 U.S.C. § 1104(a)(1)(A) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries; and ... defraying reasonable expenses of administering the plan[.]”). Modest financial burdens may be tolerable when the state laws imposing them do not directly implicate an ERISA core administrative concern. But the statute and regulation here require reporting of health claims, pharmacy claims, etc., information about the essential functioning of employee health plans.