(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GOBEILLE, CHAIR OF THE VERMONT GREEN MOUNTAIN CARE BOARD *v.* LIBERTY MUTUAL INSURANCE CO.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 14–181. Argued December 2, 2015—Decided March 1, 2016

Vermont law requires certain entities, including health insurers, to report payments relating to health care claims and other information relating to health care services to a state agency for compilation in an all-inclusive health care database. Respondent Liberty Mutual Insurance Company's health plan (Plan), which provides benefits in all 50 States, is an "employee welfare benefit plan" under the Employee Retirement Income Security Act of 1974 (ERISA). The Plan's third-party administrator, Blue Cross Blue Shield of Massachusetts, Inc. (Blue Cross), which is subject to Vermont's disclosure statute, was ordered to transmit its files on eligibility, medical claims, and pharmacy claims for the Plan's Vermont members. Respondent, concerned that the disclosure of such confidential information might violate its fiduciary duties, instructed Blue Cross not to comply and filed suit, seeking a declaration that ERISA pre-empts application of Vermont's statute and regulation to the Plan and an injunction prohibiting Vermont from trying to acquire data about the Plan or its members. The District Court granted summary judgment to Vermont, but the Second Circuit reversed, concluding that Vermont's reporting scheme is pre-empted by ERISA.

*Held*: ERISA pre-empts Vermont's statute as applied to ERISA plans. Pp. 5–13.

(a) ERISA expressly pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U. S. C. §1144(a). As relevant here, the clause pre-empts a state law that has an impermissible "connection with" ERISA plans, *i.e.,* a law

that governs, or interferes with the uniformity of, plan administration. *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148. Pp. 5–6.

(b) The considerations relevant to the determination whether an impermissible connection exists—ERISA's objectives "as a guide to the scope of the state law that Congress understood would survive," *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656, and "the nature of" the state law's "effect . . . on ERISA plans," *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325— lead to the conclusion that Vermont's regime, as applied to ERISA plans, is pre-empted. Pp. 6–12.

(1) ERISA seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures, *Travelers*, 514 U. S., at 651, and those systems and procedures are intended to be uniform, *id.,* at 656. ERISA's extensive reporting, disclosure, and recordkeeping requirements are central to, and an essential part of, this uniform plan administration system. Vermont's law and regulation, however, also govern plan reporting, disclosure, and recordkeeping. Pre-emption is necessary in order to prevent multiple jurisdictions from imposing differing, or even parallel, regulations, creating wasteful administrative costs and threatening to subject plans to wide-ranging liability. ERISA's uniform rule design also makes clear that it is the Secretary of Labor, not the separate States, that is authorized to decide whether to exempt plans from ERISA reporting requirements or to require ERISA plans to report data such as that sought by Vermont. Pp. 7–10.

(2) Vermont's counterarguments are unpersuasive. Vermont argues that respondent has not shown that the State scheme has caused it to suffer economic costs, but respondent need not wait to bring its pre-emption claim until confronted with numerous inconsistent obligations and encumbered with any ensuing costs. In addition, the fact that ERISA and the state reporting scheme have different objectives does not transform Vermont's direct regulation of a fundamental ERISA function into an innocuous and peripheral set of additional rules. Vermont's regime also cannot be saved by invoking the State's traditional power to regulate in the area of public health. Pp. 10–12.

(c) ERISA's pre-existing reporting, disclosure, and recordkeeping provisions maintain their pre-emptive force regardless of whether the new Patient Protection and Affordable Care Act's reporting obligations also pre-empt state law. Pp. 12–13.

746 F. 3d 497, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,

Syllabus

C. J., and THOMAS, BREYER, ALITO, and KAGAN, JJ., joined. THOMAS, J., and BREYER, J., filed concurring opinions. GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–181

ALFRED GOBEILLE, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE VERMONT GREEN MOUNTAIN CARE BOARD, PETITIONER *v.* LIBERTY MUTUAL INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 1, 2016]

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents a challenge to the applicability of a state law requiring disclosure of payments relating to health care claims and other information relating to health care services. Vermont enacted the statute so it could maintain an all-inclusive health care database. Vt. Stat. Ann., Tit. 18, §9410(a)(1) (2015 Cum. Supp.) (V. S. A.). The state law, by its terms, applies to health plans established by employers and regulated by the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.* The question before the Court is whether ERISA pre-empts the Vermont statute as it applies to ERISA plans.

I

A

Vermont requires certain public and private entities that provide and pay for health care services to report information to a state agency. The reported information is

compiled into a database reflecting "all health care utiliza-
tion, costs, and resources in [Vermont], and health care
utilization and costs for services provided to Vermont
residents in another state." 18 V. S. A. §9410(b). A data-
base of this kind is sometimes called an all-payer claims
database, for it requires submission of data from all health
insurers and other entities that pay for health care ser-
vices. Almost 20 States have or are implementing similar
databases. See Brief for State of New York et al. as *Amici
Curiae* 1, and n. 1.

Vermont's law requires health insurers, health care
providers, health care facilities, and governmental agen-
cies to report any "information relating to health care
costs, prices, quality, utilization, or resources required" by
the state agency, including data relating to health insur-
ance claims and enrollment. §9410(c)(3). Health insurers
must submit claims data on members, subscribers, and
policyholders. §9410(h). The Vermont law defines health
insurer to include a "self-insured . . . health care benefit
plan," §9402(8), as well as "any third party administrator"
and any "similar entity with claims data, eligibility data,
provider files, and other information relating to health
care provided to a Vermont resident." §9410(j)(1)(B). The
database must be made "available as a resource for insur-
ers, employers, providers, purchasers of health care, and
State agencies to continuously review health care utili-
zation, expenditures, and performance in Vermont."
§9410(h)(3)(B).

Vermont law leaves to a state agency the responsibility
to "establish the types of information to be filed under this
section, and the time and place and the manner in which
such information shall be filed." §9410(d). The law has
been implemented by a regulation creating the Vermont
Healthcare Claims Uniform Reporting and Evaluation
System. The regulation requires the submission of "medi-
cal claims data, pharmacy claims data, member eligibility

data, provider data, and other information," Reg. H–2008–01, Code of Vt. Rules 21–040–021, §4(D) (2016) (CVR), in accordance with specific formatting, coding, and other requirements, §5. Under the regulation, health insurers must report data about the health care services provided to Vermonters regardless of whether they are treated in Vermont or out-of-state and about non-Vermonters who are treated in Vermont. §4(D); see also §1. The agency at present does not collect data on denied claims, §5(A)(8), but the statute would allow it to do so.

Covered entities (reporters) must register with the State and must submit data monthly, quarterly, or annually, depending on the number of individuals that an entity serves. The more people served, the more frequently the reports must be filed. §§4, 6(I). Entities with fewer than 200 members need not report at all, *ibid.*, and are termed "voluntary" reporters as distinct from "mandated" reporters, §3. Reporters can be fined for not complying with the statute or the regulation. §10; 18 V. S. A. §9410(g).

B

Respondent Liberty Mutual Insurance Company maintains a health plan (Plan) that provides benefits in all 50 States to over 80,000 individuals, comprising respondent's employees, their families, and former employees. The Plan is self-insured and self-funded, which means that Plan benefits are paid by respondent. The Plan, which qualifies as an "employee welfare benefit plan" under ERISA, 29 U. S. C. §1002(1), is subject to "ERISA's comprehensive regulation," *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 650 (1995). Respondent, as the Plan sponsor, is both a fiduciary and plan administrator.

The Plan uses Blue Cross Blue Shield of Massachusetts, Inc. (Blue Cross) as a third-party administrator. Blue Cross manages the "processing, review, and payment" of

claims for respondent. *Liberty Mut. Ins. Co.* v. *Donegan*, 746 F. 3d 497, 502 (CA2 2014) (case below). In its contract with Blue Cross, respondent agreed to "hold [Blue Cross] harmless for any charges, including legal fees, judgments, administrative expenses and benefit payment require-ments, . . . arising from or in connection with [the Plan] or due to [respondent's] failure to comply with any laws or regulations." App. 82. The Plan is a voluntary reporter under the Vermont regulation because it covers some 137 Vermonters, which is fewer than the 200-person cutoff for mandated reporting. Blue Cross, however, serves several thousand Vermonters, and so it is a mandated reporter. Blue Cross, therefore, must report the information it possesses about the Plan's members in Vermont.

In August 2011, Vermont issued a subpoena ordering Blue Cross to transmit to a state-appointed contractor all the files it possessed on member eligibility, medical claims, and pharmacy claims for Vermont members. *Id.,* at 33. (For clarity, the Court uses "Vermont" to refer not only to the State but also to state officials acting in their official capacity.) The penalty for noncompliance, Vermont threatened, would be a fine of up to $2,000 a day and a suspension of Blue Cross' authorization to operate in Vermont for as long as six months. *Id.,* at 31. Respond-ent, concerned in part that the disclosure of confidential information regarding its members might violate its fidu-ciary duties under the Plan, instructed Blue Cross not to comply. Respondent then filed this action in the United States District Court for the District of Vermont. It sought a declaration that ERISA pre-empts application of Vermont's statute and regulation to the Plan and an in-junction forbidding Vermont from trying to acquire data about the Plan or its members.

Vermont filed a motion to dismiss, which the District Court treated as one for summary judgment, see Fed. Rule Civ. Proc. 12(d), and respondent filed a cross-motion for

summary judgment. The District Court granted summary judgment to Vermont. It first held that respondent, despite being a mere voluntary reporter, had standing to sue because it was faced with either allegedly violating its "fiduciary and administrative responsibilities to the Plan" or assuming liability for Blue Cross' withholding of the data from Vermont. *Liberty Mut. Ins. Co.* v. *Kimbell*, No. 2:11–cv–204 (D Vt., Nov. 9, 2012), p. 12. The District Court then concluded that the State's reporting scheme was not pre-empted. Although that scheme "may have some indirect effect on health benefit plans," the court reasoned that the "effect is so peripheral that the regulation cannot be considered an attempt to interfere with the administration or structure of a welfare benefit plan." *Id.*, at 31–32.

The Court of Appeals for the Second Circuit reversed. The panel was unanimous in concluding that respondent had standing, but it divided on the merits of the pre-emption challenge. The panel majority explained that "one of ERISA's core functions—reporting—[cannot] be laden with burdens, subject to incompatible, multiple and variable demands, and freighted with risk of fines, breach of duty, and legal expense." 746 F. 3d, at 510. The Vermont regime, the court held, does just that. *Id.,* at 508–510.

This Court granted certiorari to address the important issue of ERISA pre-emption. 576 U. S. ___ (2015).

## II

The text of ERISA's express pre-emption clause is the necessary starting point. It is terse but comprehensive. ERISA pre-empts

> "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U. S. C. §1144(a).

The Court has addressed the potential reach of this clause before. In *Travelers,* the Court observed that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course." 514 U. S., at 655. That is a result "no sensible person could have intended." *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 336 (1997) (Scalia, J., concurring). So the need for workable standards has led the Court to reject "uncritical literalism" in applying the clause. *Travelers*, 514 U. S., at 656.

Implementing these principles, the Court's case law to date has described two categories of state laws that ERISA pre-empts. First, ERISA pre-empts a state law if it has a "'reference to'" ERISA plans. *Ibid.* To be more precise, "[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . , that 'reference' will result in pre-emption." *Dillingham*, *supra,* at 325. Second, ERISA pre-empts a state law that has an impermissible "connection with" ERISA plans, meaning a state law that "governs . . . a central matter of plan administration" or "interferes with nationally uniform plan administration." *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148 (2001). A state law also might have an impermissible connection with ERISA plans if "acute, albeit indirect, economic effects" of the state law "force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Travelers*, *supra*, at 668. When considered together, these formulations ensure that ERISA's express pre-emption clause receives the broad scope Congress intended while avoiding the clause's susceptibility to limitless application.

## III

Respondent contends that Vermont's law falls in the

second category of state laws that are pre-empted by ERISA: laws that govern, or interfere with the uniformity of, plan administration and so have an impermissible "'connection with'" ERISA plans. *Egelhoff*, *supra*, at 148; *Travelers*, 514 U. S., at 656. When presented with these contentions in earlier cases, the Court has considered "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *ibid.*, and "the nature of the effect of the state law on ERISA plans," *Dillingham*, *supra*, at 325. Here, those considerations lead the Court to conclude that Vermont's regime, as applied to ERISA plans, is pre-empted.

## A

ERISA does not guarantee substantive benefits. The statute, instead, seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures. *Travelers*, 514 U. S., at 651. Those systems and procedures are intended to be uniform. *Id.*, at 656 (ERISA's pre-emption clause "indicates Congress's intent to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern'" (quoting *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 523 (1981))). "Requiring ERISA administrators to master the relevant laws of 50 States and to contend with litigation would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators—burdens ultimately borne by the beneficiaries." *Egelhoff*, *supra*, at 149–150 (quoting *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990)); see also *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 9 (1987).

ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive. ERISA plans must present participants with a plan description explaining, among other things, the plan's eligi-

bility requirements and claims-processing procedures. §§1021(a)(1), 1022, 1024(b)(1). Plans must notify participants when a claim is denied and state the basis for the denial. §1133(1). Most important for the pre-emption question presented here, welfare benefit plans governed by ERISA must file an annual report with the Secretary of Labor. The report must include a financial statement listing assets and liabilities for the previous year and, further, receipts and disbursements of funds. §§1021(b), 1023(b)(1), 1023(b)(3)(A)–(B), 1024(a). The information on assets and liabilities as well as receipts and disbursements must be provided to plan participants on an annual basis as well. §§1021(a)(2), 1023(b)(3)(A)–(B), 1024(b)(3). Because welfare benefit plans are in the business of providing benefits to plan participants, a plan's reporting of data on disbursements by definition incorporates paid claims. See Dept. of Labor, Schedule H (Form 5500) Financial Information (2015) (requiring reporting of "[b]enefit claims payable" and "[b]enefit payment and payments to provide benefits"), online at http://www.dol.gov/ebsa/pdf/2015-5500-Schedule-H.pdf (as last visited Feb. 26, 2016).

The Secretary of Labor has authority to establish additional reporting and disclosure requirements for ERISA plans. ERISA permits the Secretary to use the data disclosed by plans "for statistical and research purposes, and [to] compile and publish such studies, analyses, reports, and surveys based thereon as he may deem appropriate." §1026(a). The Secretary also may, "in connection" with any research, "collect, compile, analyze, and publish data, information, and statistics relating to" plans. §1143(a)(1); see also §1143(a)(3) (approving "other studies relating to employee benefit plans, the matters regulated by this subchapter, and the enforcement procedures provided for under this subchapter").

ERISA further permits the Secretary of Labor to "re-

quir[e] any information or data from any [plan] where he finds such data or information is necessary to carry out the purposes of" the statute, §1024(a)(2)(B), and, when investigating a possible statutory violation, "to require the submission of reports, books, and records, and the filing of data" related to other requisite filings, §1134(a)(1). The Secretary has the general power to promulgate regulations "necessary or appropriate" to administer the statute, §1135, and to provide exemptions from any reporting obligations, §1024(a)(3).

It should come as no surprise, then, that plans must keep detailed records so compliance with ERISA's reporting and disclosure requirements may be "verified, explained, or clarified, and checked for accuracy and completeness." §1027. The records to be retained must "include vouchers, worksheets, receipts, and applicable resolutions." *Ibid.*; see also §1135 (allowing the Secretary to "provide for the keeping of books and records, and for the inspection of such books and records").

These various requirements are not mere formalities. Violation of any one of them may result in both civil and criminal liability. See §§1131–1132.

As all this makes plain, reporting, disclosure, and recordkeeping are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA. The Court, in fact, has noted often that these requirements are integral aspects of ERISA. See, *e.g.*, *Dillingham*, 519 U. S., at 327; *Travelers, supra,* at 651; *Ingersoll-Rand, supra,* at 137; *Massachusetts* v. *Morash*, 490 U. S. 107, 113, 115 (1989); *Fort Halifax, supra*, at 9; *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 732 (1985).

Vermont's reporting regime, which compels plans to report detailed information about claims and plan members, both intrudes upon "a central matter of plan administration" and "interferes with nationally uniform plan

administration." *Egelhoff*, 532 U. S., at 148. The State's law and regulation govern plan reporting, disclosure, and—by necessary implication—recordkeeping. These matters are fundamental components of ERISA's regulation of plan administration. Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability. See, *e.g.,* 18 V. S. A. §9410(g) (supplying penalties for violation of Vermont's reporting rules); CVR §10 (same). Pre-emption is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting requirements on plans.

The Secretary of Labor, not the States, is authorized to administer the reporting requirements of plans governed by ERISA. He may exempt plans from ERISA reporting requirements altogether. See §1024(a)(3); 29 CFR §2520.104–44 (2005) (exempting self-insured health plans from the annual financial reporting requirement). And, he may be authorized to require ERISA plans to report data similar to that which Vermont seeks, though that question is not presented here. Either way, the uniform rule design of ERISA makes it clear that these decisions are for federal authorities, not for the separate States.

B

Vermont disputes the pre-emption of its reporting regime on several fronts. The State argues that respondent has not demonstrated that the reporting regime in fact has caused it to suffer economic costs. Brief for Petitioner 52–54. But respondent's challenge is not based on the theory that the State's law must be pre-empted solely because of economic burdens caused by the state law. See *Travelers*, 514 U. S., at 668. Respondent argues, rather, that Vermont's scheme regulates a central aspect of plan administration and, if the scheme is not pre-empted, plans will face the possibility of a body of disuniform state re-

porting laws and, even if uniform, the necessity to accommodate multiple governmental agencies. A plan need not wait to bring a pre-emption claim until confronted with numerous inconsistent obligations and encumbered with any ensuing costs.

Vermont contends, furthermore, that ERISA does not pre-empt the state statute and regulation because the state reporting scheme has different objectives. This Court has recognized that "[t]he principal object of [ERISA] is to protect plan participants and beneficiaries." *Boggs* v. *Boggs*, 520 U. S. 833, 845 (1997). And "[i]n enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds." *Morash*, *supra*, at 115. The State maintains that its program has nothing to do with the financial solvency of plans or the prudent behavior of fiduciaries. See Brief for Petitioner 29. This does not suffice to avoid federal pre-emption.

"[P]re-emption claims turn on Congress's intent." *Travelers*, 514 U. S., at 655. The purpose of a state law, then, is relevant only as it may relate to the "scope of the state law that Congress understood would survive," *id.*, at 656, or "the nature of the effect of the state law on ERISA plans," *Dillingham*, *supra*, at 325. In *Travelers*, for example, the Court noted that "[b]oth the purpose and the effects of" the state law at issue "distinguish[ed] it from" laws that "function as a regulation of an ERISA plan itself." 514 U. S., at 658–659. The perceived difference here in the objectives of the Vermont law and ERISA does not shield Vermont's reporting regime from pre-emption. Vermont orders health insurers, including ERISA plans, to report detailed information about the administration of benefits in a systematic manner. This is a direct regulation of a fundamental ERISA function. Any difference in purpose does not transform this direct regulation of "a

central matter of plan administration," *Egelhoff*, *supra*, at 148, into an innocuous and peripheral set of additional rules.

The Vermont regime cannot be saved by invoking the State's traditional power to regulate in the area of public health. The Court in the past has "addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law," in particular state laws regulating a subject of traditional state power. *Travelers*, *supra*, at 654–655. ERISA, however, "certainly contemplated the pre-emption of substantial areas of traditional state regulation." *Dillingham*, 519 U. S., at 330. ERISA pre-empts a state law that regulates a key facet of plan administration even if the state law exercises a traditional state power. See *Egelhoff*, 532 U. S., at 151–152. The fact that reporting is a principal and essential feature of ERISA demonstrates that Congress intended to pre-empt state reporting laws like Vermont's, including those that operate with the purpose of furthering public health. The analysis may be different when applied to a state law, such as a tax on hospitals, see *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, 520 U. S. 806 (1997), the enforcement of which necessitates incidental reporting by ERISA plans; but that is not the law before the Court. Any presumption against pre-emption, whatever its force in other instances, cannot validate a state law that enters a fundamental area of ERISA regulation and thereby counters the federal purpose in the way this state law does.

IV

Respondent suggests that the Patient Protection and Affordable Care Act (ACA), which created new reporting obligations for employer-sponsored health plans and incorporated those requirements into the body of ERISA, further demonstrates that ERISA pre-empts Vermont's

reporting regime. See 29 U. S. C. §1185d; 42 U. S. C. §§300gg–15a, 17; §18031(e)(3). The ACA, however, specified that it shall not "be construed to preempt any State law that does not prevent the application of the provisions" of the ACA. 42 U. S. C. §18041(d). This anti-preemption provision might prevent any new ACA-created reporting obligations from pre-empting state reporting regimes like Vermont's, notwithstanding the incorporation of these requirements in the heart of ERISA. But see 29 U. S. C. §1191(a)(2) (providing that the new ACA provisions shall not be construed to affect or modify the ERISA pre-emption clause as applied to group health plans); 42 U. S. C. §300gg–23(a)(2) (same).

The Court has no need to resolve this issue. ERISA's pre-existing reporting, disclosure, and recordkeeping provisions—upon which the Court's conclusion rests—maintain their pre-emptive force whether or not the new ACA reporting obligations also pre-empt state law.

\*　　\*　　\*

ERISA's express pre-emption clause requires invalidation of the Vermont reporting statute as applied to ERISA plans. The state statute imposes duties that are inconsistent with the central design of ERISA, which is to provide a single uniform national scheme for the administration of ERISA plans without interference from laws of the several States even when those laws, to a large extent, impose parallel requirements. The judgment of the Court of Appeals for the Second Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–181

_____

ALFRED GOBEILLE, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE VERMONT GREEN MOUNTAIN
CARE BOARD, PETITIONER *v.* LIBERTY
MUTUAL INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 1, 2016]

JUSTICE THOMAS, concurring.

I join the Court's opinion because it faithfully applies our precedents interpreting 29 U. S. C. §1144, the express pre-emption provision of the Employee Retirement Income Security Act of 1974 (ERISA). I write separately because I have come to doubt whether §1144 is a valid exercise of congressional power and whether our approach to ERISA pre-emption is consistent with our broader pre-emption jurisprudence.

I

Section 1144 contains what may be the most expansive express pre-emption provision in any federal statute. Section 1144(a) states: "Except as provided" in §1144(b) ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Under the ordinary meaning of the phrase "relate to," §1144(a) pre-empts all state laws that "'stand in some relation'" to, "'have bearing or concern'" on, "'pertain'" to, "'refer'" to, or '"bring into association with or connection with'" an ERISA plan. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 97, n. 16 (1983) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). And §1144(b) seemingly acknow-

ledges how broadly §1144(a) extends by excepting "generally applicable criminal law[s]" and state laws "regulat[ing] insurance, banking, or securities"—but not generally applicable civil laws—from pre-emption. §§1144(b)(2)(A), (b)(4). Section 1144, in sum, "is clearly expansive"—so much so that "one might be excused for wondering, at first blush, whether the words of limitation ('insofar as they . . . relate') do much limiting." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995).

Read according to its plain terms, §1144 raises constitutional concerns. "[T]he Supremacy Clause gives 'supreme' status only to those [federal laws] that are 'made in Pursuance'" of the Constitution. *Wyeth* v. *Levine*, 555 U. S. 555, 585 (2009) (THOMAS, J., concurring in judgment) (quoting Art. VI, cl. 2). But I question whether any provision of Article I authorizes Congress to prohibit States from applying a host of generally applicable civil laws to ERISA plans. "The Constitution requires a distinction between what is truly national and what is truly local." *United States* v. *Morrison*, 529 U. S. 598, 617–618 (2000). If the Federal Government were "to take over the regulation of entire areas of traditional state concern," including "areas having nothing to do with the regulation of commercial activities," then "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *United States* v. *Lopez*, 514 U. S. 549, 577 (1995) (KENNEDY, J., concurring). Just because Congress can regulate some aspects of ERISA plans pursuant to the Commerce Clause does not mean that Congress can exempt ERISA plans from state regulations that have nothing to do with interstate commerce. See *Gonzales* v. *Raich*, 545 U. S. 1, 59–60 (2005) (THOMAS, J., dissenting).

## II

This Court used to interpret §1144 according to its text. But we became uncomfortable with how much state law §1144 would pre-empt if read literally. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy," we explained, "then for all practical purposes pre-emption would never run its course." *Travelers, supra*, at 655.

Rather than addressing the constitutionality of §1144, we abandoned efforts to give its text its ordinary meaning. In *Travelers*, we adopted atextual but what we thought to be "workable" standards to construe §1144. *Ante,* at 6. Thus, to determine whether a state law impermissibly "relates to" an ERISA plan due to some "connection with" that plan, we now "look both to the objectives of the ERISA statute . . . as well as to the nature of the effect of the state law on ERISA plans." *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 147 (2001) (citing *Travelers*; internal quotation marks omitted).

We decided *Travelers* in 1995. I joined that opinion and have joined others applying the approach we adopted in *Travelers*. But our interpretation of ERISA's express pre-emption provision has become increasingly difficult to reconcile with our pre-emption jurisprudence. *Travelers* departed from the statutory text, deeming it "unhelpful." 514 U. S., at 656. But, in other cases involving express pre-emption provisions, the text has been the beginning and often the end of our analysis. *E.g., Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. 582, 594 (2011) ("'focus[ing] on the plain wording'" to define the scope of the Immigration Reform and Control Act's express pre-emption clause); see also *National Meat Assn.* v. *Harris*, 565 U. S. \_\_\_, \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 4, 6–10) (parsing the text to determine the scope of the Federal Meat Inspection Act's express pre-emption clause). We have likewise refused to look to policy limits that are not "remotely discernible in the statutory text."

*Whiting, supra,* at 599.  We have not given a sound basis for departing from these principles and treating §1144 differently from other express pre-emption provisions.

   *Travelers'* approach to ERISA pre-emption also does not avoid constitutional concerns.  We have continued to interpret §1144 as pre-empting "substantial areas of traditional state regulation" and "pre-empt[ing] a state law . . . even if the state law exercises a traditional state power." *Ante*, at 13 (internal quotation marks omitted).  Until we confront whether Congress had the constitutional authority to pre-empt such a wide array of state laws in the first place, the Court—and lower courts—will continue to struggle to apply §1144.  It behooves us to address whether Article I gives Congress such power and whether §1144 may permissibly be read to avoid unconstitutional results.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–181

_____

ALFRED GOBEILLE, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE VERMONT GREEN MOUNTAIN
CARE BOARD, PETITIONER *v.* LIBERTY
MUTUAL INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 1, 2016]

JUSTICE BREYER, concurring.

I write separately to emphasize that a failure to find pre-emption here would subject self-insured health plans under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.*, to 50 or more potentially conflicting information reporting requirements. Doing so is likely to create serious administrative problems. The Court points out that the respondent's plan provides benefits to over 80,000 individuals living in 50 different States. See *ante,* at 3. In addition, *amici curiae* tell us that self-insured, ERISA-based health plans provide benefits to 93 million Americans. Brief for American Benefits Council et al. as *Amici Curiae* 8. If each State is free to go its own way, each independently determining what information each plan must provide about benefits, the result could well be unnecessary, duplicative, and conflicting reporting requirements, any of which can mean increased confusion and increased cost. Private standard setting can of course help alleviate these problems, but given the large number of different possible regulations, I do not believe that is sufficient. Cf. A. Costello & M. Taylor, APCD Council & NAHDO, Standardization of Data Collection in All-Payer

Claims Databases 3–4 (Jan. 2011), online at https://www.apcdcouncil.org/publication/standardization-data-collection-all-payer-claims-databases (as last visited Feb. 26, 2016).

I would also emphasize that pre-emption does not necessarily prevent Vermont or other States from obtaining the self-insured, ERISA-based health-plan information that they need. States wishing to obtain information can ask the Federal Government for appropriate approval. As the majority points out, the "Secretary of Labor has authority to establish additional reporting and disclosure requirements for ERISA plans." *Ante,* at 8; see 29 U. S. C. §1135. Moreover, the Secretary "is authorized to undertake research and surveys and in connection therewith to collect, compile, analyze and publish data, information, and statistics relating to employee benefit plans, including retirement, deferred compensation, and welfare plans." §1143(a)(1). At least one other important statute provides the Secretary of Health and Human Services with similar authority. See 42 U. S. C. §300gg–17(a) (part of the Patient Protection and Affordable Care Act that is applicable to group health insurance plans including ERISA plans); Brief for United States as *Amicus Curiae* 4 (the Department of Labor, the Department of Health and Human Services, and the Department of Treasury are "currently considering a rulemaking to require health plans to report more detailed information about various aspects of plan administration, such as enrollment, claims processing, and benefit offerings").

I see no reason why the Secretary of Labor could not develop reporting requirements that satisfy the States' needs, including some State-specific requirements, as appropriate. Nor do I see why the Department could not delegate to a particular State the authority to obtain data related to that State, while also providing the data to the Federal Secretary for use by other States or at the federal

level.

Although the need for federal approval or authorization limits to some degree the States' power to obtain information, requiring that approval has considerable advantages. The federal agencies are more likely to be informed about, and to understand, ERISA-related consequences and health-care needs from a national perspective. Their involvement may consequently secure for the States necessary information without unnecessarily creating costly conflicts—particularly when compared with such alternatives as giving each State free rein to go its own way or asking nonexpert federal courts to try to iron out, regulation by regulation, such conflicts. Cf. *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 506 (1996) (BREYER, J., concurring in part and concurring in judgment) (reading a complex, ambiguous regulatory statute to permit "informed agency involvement" is more likely to achieve Congress' general objectives).

For these reasons, and others that the majority sets forth, I agree that Vermont's statute is pre-empted because it "interferes with nationally uniform plan administration." *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148 (2001).

# SUPREME COURT OF THE UNITED STATES

___

No. 14–181

___

ALFRED GOBEILLE, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE VERMONT GREEN MOUNTAIN
CARE BOARD, PETITIONER *v.* LIBERTY
MUTUAL INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 1, 2016]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR
joins, dissenting.

To better control health care outcomes and costs, Vermont requires all public and private entities that pay for
health care services provided to Vermont residents to
supply data to the State's all-payer claims database.
Many States have similar databases in place or in development. The question presented in this case is whether
Vermont's health care data-collection law is preempted by
the Employer Retirement Income Security Act of 1974
(ERISA), 88 Stat. 832, 29 U. S. C. §1001 *et seq.*, the federal
law regulating employee benefit plans. I would hold that
Vermont's effort to track health care services provided to
its residents and the cost of those services does not impermissibly intrude on ERISA's dominion over employee
benefit plans.

I

In 2005, the Vermont Legislature established the Vermont Health Care Uniform Reporting and Evaluation
System, a database populated by information on health
care claims paid by insurers and other coverage providers.
See Vt. Stat. Ann., Tit. 18, §9410 (2015 Cum. Supp.); Reg.

H–2008–01, Code Vt. Rules 21–040–021, §4(D) (2016) (directing insurers and other coverage providers to "submit medical claims data, pharmacy claims data, member eligibility data, provider data, and other information related to health care provided to Vermont residents and health care provided by Vermont health care providers and facilities"). Health insurers and other coverage providers must report the required data if they cover at least 200 Vermont residents. §3(Ab).

Seventeen other States have enacted similar database systems, called "all-payer claims databases."[1] These States, like Vermont, collect health-claims data to serve compelling interests, including identification of reforms effective to drive down health care costs, evaluation of relative utility of different treatment options, and detection of instances of discrimination in the provision of care. See Brief for National Governors Association et al. as *Amici Curiae* 11–14; Brief for Harvard Law School Center for Health Law and Policy Innovation et al. as *Amici Curiae* 11–18; Brief for State of New York et al. as *Amici Curiae* 12–20. See also Vt. Stat. Ann., Tit. 18, §9410(a)(1) (Vermont's data-collection law is designed to help "identif[y] health care needs and infor[m] health care policy," "evaluat[e] the effectiveness of intervention programs on improving patient outcomes," "compar[e] costs between various treatment settings and approaches," "determin[e] the capacity and distribution of existing resources," and "provid[e] information to . . . purchasers of health care").[2]

—————

[1] States, in addition to Vermont, so far maintaining all-payer claims databases are: Arkansas, Colorado, Connecticut, Kansas, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New York, Oregon, Rhode Island, Tennessee, Utah, Virginia, Washington, and West Virginia. Brief for National Governors Association et al. as *Amici Curiae* 8, and n. 9.

[2] Illustrative of the utility of all-payer claims databases, Minnesota

Respondent Liberty Mutual Insurance Company (Liberty), in common with legions of employers, provides health care to its employees through a self-insured plan, administered by Blue Cross/Blue Shield (Blue Cross).[3]  Because Blue Cross administers thousands of health care policies in Vermont, the State requires it to report data for all of the plans it administers, and Blue Cross has complied with this mandate.  In 2010, for example, Blue Cross reported data on over 7,000 Vermont health care-plan beneficiaries.  Roughly half of the beneficiaries received coverage through self-insured employer policies.  App. 205.  In 2011, at Liberty's request, Blue Cross did not submit data on Vermont residents who received coverage through Liberty's plan.  *Id.*, at 21–23.  Vermont ordered Blue Cross to provide the claims data.  *Id.,* at 23, 31–33.  Liberty instructed Blue Cross not to comply and, shortly thereafter, filed the instant suit, seeking to block Vermont from obtaining the data.

In defense of its resistance to Vermont's data-collection law, Liberty relies on its plan's status as an ERISA-covered "employee welfare benefit plan," defined as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness."  29 U. S. C. §1002(1).  Because ERISA directs plan fiduciaries to conserve plan assets for the purpose of "providing bene-

_____

evaluated data on emergency-room visits and concluded that the condition causing two of every three visits could have been treated more efficiently, and as effectively, in a nonhospital setting.  Brief for State of New York et al. as *Amici Curiae* 12–13.

[3] Liberty's plan would not, on its own, trigger Vermont's reporting requirements.  As of 2011, only 137 plan participants resided in the State, out of the total 84,711 individuals covered by Liberty's plan.  App. to Pet. for Cert. 50.

fits to participants," §1104(a)(1)(A)(ii), Liberty maintains that ERISA preempts diverse state health-claims reporting laws. If there is to be mandatory health-claims reporting by ERISA plans, Liberty urges, the source of the mandate should be a uniform national reporting regime. See Brief for Respondent 26–29; Tr. of Oral Arg. 32–33.

Opposing ERISA-grounded preemption of its data-collection law, Vermont points out that the efficacy of the State's law depends on comprehensive reporting, *i.e.,* collecting data on numerous beneficiaries from each of several major segments of the health care market. See Brief for Petitioner 12; Brief for Harvard Law School Center for Health Law and Policy Innovation et al. as *Amici Curiae* 18–19.[4] About half of Americans with health insurance receive coverage from their employers, Dept. of Commerce, Bureau of Census, J. Smith & C. Medalia, Health Insurance Coverage in the United States: 2013, p. 2 (2014), and 61% of such persons are covered by an employer's self-insured plan. Brief for Harvard Law School Center for Health Law and Policy Innovation et al. as *Amici Curiae* 20. In Vermont, about 20% of the database's total content originates from employer self-insured plans. Brief for Petitioner 12, and n. 10. Stopping States from collecting claims data from self-insured employer health care plans would thus hugely undermine the reporting regimes on which Vermont and other States depend to maintain and improve the quality, and hold down the cost, of health care services.

The United States District Court for the District of Vermont rejected Liberty's plea for preemption. Ver-

---

[4] The Federal Government supplies Medicare claims data to Vermont and other States that maintain similar databases. See 42 U. S. C. §1395kk(e) (requiring the Department of Health and Human Services (HHS) to make Medicare data available to state health-claims databases). And HHS has authorized the States to include Medicaid claims data in their databases. See Brief for United States as *Amicus Curiae* 7.

mont's data-collection law, that court determined, served the State's undoubted interest in regulating health care markets, and did not substantially interfere with the operation of Liberty's ERISA plans. See App. to Pet. for Cert. 64–66, 78–79. The Court of Appeals for the Second Circuit reversed, two to one. *Liberty Mut. Ins. Co.* v. *Donegan*, 746 F. 3d 497 (2014). The majority acknowledged that the Supreme Court's ERISA-preemption decisions of the 1990's "marked something of a pivot" in starting with a presumption "'that Congress does not intend to supplant state law,' especially if the 'state action [occurs] in fields of traditional state regulation,' like health care." *Id.,* at 506 (quoting *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 654–655 (1995)). Nonetheless, the majority concluded that ERISA preempted the application of Vermont's data-collection law to Liberty's plan. 746 F. 3d*,* at 506, 508. The reporting of information about plan benefits, the majority reasoned, qualifies as a "core ERISA functio[n]" and, therefore, must be "subject to a uniform federal standard." *Id.,* at 505, 508. Judge Straub dissented, offering a concise critique of the majority's opinion:

> "The majority finds that the burden imposed by the Vermont reporting requirement warrants preemption of the [data-collection] statute. This conclusion falters for two primary reasons. First, the reporting requirement imposed by the Vermont statute differs in kind from the 'reporting' that is required by ERISA and therefore was not the kind of state law Congress intended to preempt. Second, Liberty Mutual has failed to show any actual burden, much less a burden that triggers ERISA preemption. Rather, the Vermont statute . . . does not interfere with an ERISA plan's administration of benefits." *Id.,* at 511.

## II

Essentially for the reasons Judge Straub identified, I would hold that ERISA does not preempt Vermont's data-collection statute. That law and ERISA serve different purposes. ERISA's domain is the design and administration of employee benefit plans: notably, prescriptions on the vesting of benefits, claims processing, and the designation of beneficiaries. See *Travelers*, 514 U. S., at 656 ("Congress intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law. . . ." (internal quotation marks omitted)). Its reporting requirements, geared to those functions, ensure that the plans in fact provide covered benefits. Vermont's data-collection statute, in contrast, aims to improve the quality and utilization, and reduce the cost, of health care in Vermont by providing consumers, government officials, and researchers with comprehensive data about the health care delivery system. Nor does Vermont's law impose burdens on ERISA plans of the kind this Court has found sufficient to warrant preemption.

ERISA's preemption clause provides that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U. S. C. §1144(a). Lacking clear direction from the clause's "opaque" text, *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, 520 U. S. 806, 809 (1997), the Court has sought to honor Congress' evident call for an expansive preemption principle without invalidating state regulations falling outside ERISA's domain. See *Travelers*, 514 U. S., at 655–656 ("The governing text of [the] ERISA [preemption clause] is clearly expansive. . . . [But] [i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally,

relations stop nowhere." (some internal quotation marks omitted)).[5]

Seeking to bring some measure of determinacy to ERISA preemption, the Court has stated: "[A] law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." *Id.,* at 656 (some internal quotation marks omitted). In this case, the Court of Appeals found, and the parties do not here contest, that Vermont's data-collection law lacks "reference to" ERISA plans because the law applies to all health care payers and does not home in on ERISA plans. See 746 F. 3d, at 508, n. 9. The question, therefore, is whether the law has an impermissible "connection with" ERISA plans. Because the term "'connection with' is scarcely more restrictive than 'relate to,'" the Court has "cautioned against . . . uncritical literalism," *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 147 (2001) (internal quotation marks omitted), and has set out this further formulation: "[T]o determine whether a state law has the forbidden connection, we look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Ibid.* (internal quotation marks omitted).

In framing preemption doctrine, the Court does not "assum[e] lightly that Congress has derogated state regulation, but instead . . . addresse[s] claims of pre-emption with the starting presumption that Congress does not

-----

[5] I have joined opinions proposing that the Court acknowledge that the "'relate to' clause of the pre-emption provision is meant, not to set forth a *test* for pre-emption, but rather to identify the field in which ordinary *field pre-emption* applies—namely, the field of laws regulating" employee-benefit plans. *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 336 (1997) (Scalia, J., concurring); *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 153 (2001) (Scalia, J., concurring). Whether measured against ordinary preemption principles or this Court's ERISA-specific precedent, Vermont's data-collection law should survive inspection.

intend to supplant state law," *Travelers*, 514 U. S., at 654, especially where the State's regulation deals with "matters of health and safety," *De Buono*, 520 U. S., at 814 (internal quotation marks omitted). In *Travelers* and subsequent decisions upholding state laws against preemption challenges, this Court made clear that this presumption plays an important role in ERISA cases. *Travelers*, 514 U. S., at 654, 661; *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325, 330–331 (1997); *De Buono*, 520 U. S., at 814. Vermont's data-collection law is a vital part of the State's control of its own health care market. See *supra,* at 1–2, 4; 746 F. 3d, at 513 (Straub, J., dissenting). The presumption against preemption should thus apply full strength, and Liberty has not rebutted it, *i.e.,* it has not shown that ERISA demands the preemption of Vermont's data-collection law. To the contrary, the Court's ERISA preemption precedent points *against* preemption in this case.

### A

To determine whether Vermont's data-collection law, as applied to Liberty's plan, has an impermissible "connection with" ERISA plans, I look first to the "objectives of the ERISA statute as a guide." *Egelhoff*, 532 U. S., at 147; *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. ___, ___ (2015) (slip op., at 11) (emphasizing "the importance of considering the *target* at which the state law *aims*" in applying ordinary field-preemption principles). Because ERISA's reporting requirements and the Vermont law elicit different information and serve distinct purposes, there is no sensible reason to find the Vermont data-collection law preempted.

ERISA-covered benefit plans must, absent exemption, file annual reports containing financial and actuarial data to enable the Secretary of Labor to evaluate plans' management and solvency. See 29 U. S. C. §§1023, 1024(a)(2)(B); *Dillingham*, 519 U. S., at 326–327 (Con-

gress "established extensive reporting . . . requirements" to protect against "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees' benefits from accumulated funds." (internal quotation marks omitted)).[6]

Beyond debate, Vermont's data-collection law does not seek to regulate the management and solvency of ERISA-covered welfare plans. See *supra,* at 2 (reciting objectives of the Vermont data-collection law). Vermont requests no information on plan finances. See Reg. H–2008–01, Code of Vt. Rules 21–040–021, §4(D); *supra,* at 2 (detailing the types of data collected by Vermont). The State collects data on paid health care claims, not denied claims. See §5(A)(8). Vermont seeks a better understanding of how its residents obtain health care and how effective that care is. Unlike ERISA superintendence, Vermont's interest does not lie in reviewing whether a self-insured provider is keeping its bargain to covered employees. Nor does Vermont's statute even arguably regulate relationships among the prime ERISA entities: beneficiaries, participants, administrators, employees, trustees and other fiduciaries, and the plan itself.

————————

[6] The Court suggests that the Department of Labor collects, pursuant to ERISA's reporting rules, similar information to the data that Vermont's regime elicits. See *ante,* at 8. But these reporting obligations are not remotely similar. As one of Liberty's *amici curiae* explains, the Department of Labor reporting form cited by the Court requires reporting of the "total amount of claims paid annually by the plan," not the "granular claim-by-claim" information (including data about the "location of services rendered") that Vermont collects. Brief for National Coordinating Committee for Multiemployer Plans as *Amicus Curiae* 15, n. 4. See also Reply Brief 13, and n. 6. The data entries cited by the Court require a plan to enter, in merely a handful of boxes on a four-page form, the aggregate sums of all claims paid annually. See Dept. of Labor, Schedule H (Form 5500) Financial Information (2015), online at http://www.dol.gov/ebsa/pdf/2015-5500-Schedule-H.pdf (all Internet materials as last visited Feb. 24, 2016).

Despite these significant differences between ERISA's reporting requirements and Vermont's data-collection regime, Liberty contends that Congress intended to spare ERISA plans from benefit-related reporting requirements unless those requirements are nationally uniform. In support of this contention, Liberty points to dicta from this Court's opinions and selections from ERISA's legislative history. See, *e.g., Travelers*, 514 U. S., at 661 ("'[S]ubject matters covered by ERISA [include] reporting, disclosure, fiduciary responsibility, and the like.'" (quoting *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 98 (1983))); *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 137 (1990) (ERISA "sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans."); 120 Cong. Rec. 29942 (1974) (remarks of Sen. Javits) ("State laws compelling disclosure from . . . plans . . . will be superseded."). Far from unambiguously endorsing Liberty's sweeping view of ERISA's preemptive scope, these statements can be read at least as reasonably for the unremarkable principle that ERISA preempts state reporting rules designed to serve the same purposes as ERISA's reporting requirements. This more limited understanding is consistent with the Court's admonition to pay close attention to the "objectives of the ERISA statute as a guide." *Egelhoff*, 532 U. S., at 147.

B

Satisfied that ERISA's objectives do not require preemption of Vermont's data-collection law, I turn to the "nature of the effect of the state law on ERISA plans." *Ibid.* The imposition of some burdens on the administration of ERISA plans, the Court has held, does not suffice to require preemption. See *De Buono*, 520 U. S., at 815. While a law imposing costs so acute as to effectively dictate how a plan is designed or administered could trigger preemp-

tion, see *id.,* at 816, n. 16, no such extreme effects are present here. Moreover, no "central matter of plan administration," *Egelhoff,* 532 U. S., at 148, is touched by Vermont's data-collection law. That law prescribes no vesting requirements, benefit levels, beneficiary designations, or rules on how claims should be processed or paid. Indeed, Vermont's law does not require Liberty to do anything. The burden of compliance falls on Blue Cross, which apparently provides the data without protest on behalf of other self-funded plans. See *supra,* at 3.

Reporting and disclosure are no doubt required of ERISA plans, but those requirements are ancillary to the areas ERISA governs. Reporting and recordkeeping incident to state laws of general applicability have been upheld as they bear on ERISA plans. In *De Buono*, 520 U. S., at 809–810, 816, for example, the Court held that a gross-receipts tax on patient services provided by a hospital operated by an ERISA plan was not preempted, even though administration of the tax required filing quarterly reports. And in *Dillingham*, 519 U. S., at 319, the Court held that California's prevailing-wage law was not preempted as applied to apprenticeship programs established by ERISA plans. Prevailing-wage laws typically require employees to keep records of the wages paid to employees and make them available for review by state authorities. See, *e.g.,* Cal. Lab. Code Ann. §1776 (West 1989) (prevailing-wage law in *Dillingham*). The Second Circuit erred, then, in holding that ERISA preempts any state-law reporting obligation that is more than "slight." See 746 F. 3d, at 508–509.

The Vermont data-collection statute keeps company with the laws considered in *De Buono* and *Dillingham*: It is generally applicable and does not involve "a central matter of plan administration." *Egelhoff*, 532 U. S., at 148. And, as Judge Straub emphasized in his dissent, Liberty "failed to provide any details or showing of the

alleged burden," instead "arguing only that 'all regulations have their costs.'"   746 F. 3d, at 515 (quoting Liberty's appellate brief).

As the United States explains, the supposition indulged by the Second Circuit that Vermont's law imposed a substantial burden "is not obvious, or even particularly plausible, without any factual support."   Brief for United States as *Amicus Curiae* 28.   The data-collection law "essentially requires Blue Cross [Liberty's third-party administrator] to take information generated in the ordinary course of its claims-payment operations and report that information in a prescribed format to the [State]." *Ibid.*   The Court of Appeals majority accentuated the sheer number of data entries that must be reported to Vermont. See 746 F. 3d, at 509–510, and n. 13.   Accord *ante,* at 1 (opinion of BREYER, J.)   Entirely overlooked in that enumeration is the technological capacity for efficient computer-based data storage, formatting, and submission.   See Brief for National Association of Health Data Organizations et al. as *Amici Curiae* 7–9, 13 (describing three-step electronic path data take from health provider, to insurer or health care plan, and ultimately to the State's database).[7]   Where regulatory compliance depends upon the use of evolving technologies, it should be incumbent on the objector to show concretely what the alleged regulatory

---

[7] *Amici* supporting Liberty point to several allegedly burdensome features of compliance with Vermont's law, but they appear to be no more than everyday facets of modern regulatory compliance: installing and maintaining a software system to collect and remit data to the State, seeking variances from state regulators when health providers do not submit required information to the plan or its administrator, and reformatting data to comply with state-database formatting and encryption standards.   See Brief for Blue Cross and Blue Shield Association as *Amicus Curiae* 30–32, and nn. 7–8; Brief for National Coordinating Committee for Multiemployer Plans as *Amicus Curiae* 11–13, 16–18.

burden in fact entails.[8]

Because data-collection laws like Vermont's are not uniform from State to State, compliance is inevitably burdensome, Liberty successfully argued in the Court of Appeals. The Court replays this reasoning in today's opinion. See *ante,* at 7, 10. But state-law diversity is a hallmark of our political system and has been lauded in this Court's opinions. See, *e.g., Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n,* 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 28) ("This Court has long recognized the role of States as laboratories for devising solutions to difficult legal problems." (citing *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting); internal quotation marks omitted)). Something more than an inherent characteristic of our federal system, therefore, must underpin the ERISA-grounded preemption Liberty urges.[9]

_____

[8] Liberty contends that it need not quantify the precise cost of compliance with Vermont's law to prove that the law is burdensome. But Liberty should at least introduce concrete evidence of the alleged burdens. A finder of fact would reasonably ask, for example: Do Blue Cross's existing technologies for data storage already have capacity to store and report the data sought by Vermont? And is compliance with Vermont's reporting rules any more burdensome than compliance with other state reporting laws with which the plan already complies?

[9] Concurring in the Court's opinion, JUSTICE BREYER worries that "[i]f each State is free to go its own way, . . . the result could well be unnecessary, duplicative, and conflicting reporting requirements." *Ante,* at 1. In support, JUSTICE BREYER cites a 2011 report. A. Costello & M. Taylor, APCD Council & NAHDO, Standardization of Data Collection in All-Payer Claims Databases 1 (Jan. 1 online 2011), at https://www.apcdcouncil.org/publication/standardization-data-collection-all-payer-claims-databases. In fact, the organizations that published this report inform us, in a brief supporting Vermont, that "submitting claims data to [all-payer claims databases] . . . is a routine, straightforward process" and that States and private organizations have worked in recent years to standardize data-reporting requirements. Brief for National Association of Health Data Organizations et al. as *Amici Curiae* 13.

Liberty points to *Egelhoff* as exemplary. In *Egelhoff*, 532 U. S., at 143–144, a deceased ERISA-plan participant's ex-spouse challenged a state law that revoked her beneficiary status automatically upon her divorce, even though the ERISA plan's terms did not. The Court held that ERISA preempted the law because it "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status." *Id.,* at 147. In that context, the Court said: "Requiring ERISA administrators to master the relevant laws of 50 States . . . would undermine the congressional goal of minimizing the administrative and financial burdens on plan administrators— burdens ultimately borne by the beneficiaries." *Id.,* at 149–150 (internal quotation marks and brackets omitted).

The Court took care, however, to confine *Egelhoff* to issues implicating "a central matter of plan administration," in other words, "a core ERISA concern." *Id.,* at 147– 148. What does that category comprise? As earlier described, see *supra,* at 6, 11, prescriptions on benefit levels, beneficiary designations, vesting requirements, and rules on processing and payment of claims would rank under the central or core ERISA subject-matter rubric.[10] So, too,

---

[10] The "core ERISA concern" (or "central matter of plan administration") inquiry is not meaningfully different from the examination whether a state law is inconsistent with the "objectives of the ERISA statute." *Egelhoff*, 532 U. S., at 147; see *supra,* at 8–10. The Court appears to disagree, stating that "[a]ny difference in purpose" between ERISA and Vermont's reporting requirements "does not transform [Vermont's] direct regulation of a 'central matter of plan administration' into an innocuous and peripheral set of additional rules." *Ante,* at 11–12 (quoting *Egelhoff*, 532 U. S., at 148). In other words, the Court assumes that a state law that is not inconsistent with ERISA's purposes can nonetheless burden a "central matter of plan administration" or implicate a "core ERISA concern." Missing from the Court's opinion is any definition of these terms. What meaning can "central matter of plan administration" and "core ERISA concern" have if they are divorced from ERISA's purposes?

would reporting and disclosure obligations, but of what kind? Those that further regulation of the design and administration of employee benefit plans, *i.e.,* reporting and disclosures tied to the areas ERISA governs. ERISA's reporting and disclosure requirements are thus concerned with mismanagement of funds, failure to pay employee benefits, plan assets or allocations, all information bearing on the financial integrity of the plan. See *supra,* at 8–9. Vermont's data-collection law, eliciting information on medical claims, services provided to beneficiaries, charges and payment for those services, and demographic makeup of those receiving benefits, does not fit the bill any more than reporting relating to a plan's taxes or wage payments does.

Numerous States have informed the Court of their urgent need for information yielded by their health care data-collection laws. See Brief for National Governors Association et al. as *Amici Curiae*; Brief for State of New York et al. as *Amici Curiae*; Brief for Connecticut Health Insurance Exchange as *Amicus Curiae*; Brief for State of New Hampshire as *Amicus Curiae.* Wait until the Federal Government acts is the Court's response. The Department of Labor's capacious grant of statutory authority, the Court observes, might allow it to collect the same data Vermont and other States seek about ERISA plan health-benefit payments. See *ante,* at 10; *ante,* at 2–3 (opinion of BREYER, J.). Once the information is collected, the Court conjectures, the Department could pass the data on to the States. Cf. *ante,* at 2–3 (opinion of BREYER, J.) (suggesting that States could seek the Department's permission to enforce reporting requirements like Vermont's). It is unsettling, however, to leave the States dependent on a federal agency's grace, *i.e.,* the Department of Labor's willingness to take on a chore divorced from ERISA's

objectives.[11]

\*   \*   \*

Declaring "reporting," unmodified, a central or core ERISA function, as the Second Circuit did, 746 F. 3d, at 508, passes the line this Court drew in *Travelers*, *De Buono*, and *Dillingham* when it reined in §1144(a) so that it would no longer operate as a "super-preemption" provision. Bogan, Protecting Patient Rights Despite ERISA, 74 Tulane L. Rev. 951, 959 (2000); see *supra,* at 8. I dissent from the Court's retrieval of preemption doctrine that belongs in the discard bin.

---

[11] The Court's analysis may hamper States' abilities to require reporting, not just of plan benefits, but of plan assets as well. For example, the Department of Labor collects information about real property held in trust by a pension plan so that it can assess the plan's financial well-being. See Tr. of Oral Arg. 19. States may need to collect the same information for a very different purpose, such as assessing a property tax.